286 Md. 1 (1979)
405 A.2d 241
THE MARYLAND-NATIONAL CAPITAL PARK AND PLANNING COMMISSION
v.
GEORGE A. CHADWICK, JR. ET AL.
[No. 2, September Term, 1979.]
Court of Appeals of Maryland.
Decided September 11, 1979.
The cause was argued before MURPHY, C.J., and SMITH, DIGGES, ELDRIDGE, ORTH, COLE and DAVIDSON, JJ.
Wilhelmina G. Douglas, Associate General Counsel, and Sanford E. Wool, Deputy General Counsel, with whom was Arthur S. Drea, Jr., General Counsel, on the brief, for appellant.
Amicus curiae brief filed by Attorney General of Maryland, Stephen H. Sachs, Attorney General, and Judith A. Armold, Assistant Attorney General, on the brief.
Harry W. Lerch, with whom were Ronald L. Early and Lerch, Early & Roseman on the brief, for appellees.
*3 MURPHY, C.J., delivered the opinion of the Court.
The central issue in this case is whether the appellant, Maryland-National Capital Park and Planning Commission (the Commission), by placing the appellees' land in public "reservation" without their consent for a period not to exceed three years, as authorized by § 50-31 (a) of the Montgomery County Code (1972, 1977 Repl. Vol.), unconstitutionally deprived the landowners of the use of their property without payment of just compensation.

(1)
The Commission is a state agency authorized by Maryland Code (1957, 1978 Repl. Vol.), Art. 66D, § 5-101 (a) and (b) to acquire, by purchase or condemnation, land or other property within the Maryland-Washington Metropolitan District, comprising Montgomery and Prince George's Counties, for "parks, parkways, forests, streets, ... [for] the purposes of public recreation or the construction of public recreation centers...." The Commission is empowered by § 7-108 to prepare general and master plans for the development of the regional district, and it is responsible for coordinating planning, zoning and recreational activities within Prince George's and Montgomery Counties. See generally O & B, Inc. v. Md.-Nat'l Cap. P. & P., 279 Md. 459, 369 A.2d 553 (1977).
The Commission is required by § 2-118 (a) to submit to the county executives of the two counties an annual capital and operating budget containing, among other items, proposed expenditures for property acquisitions. In addition, it is required to prepare a Capital Improvement Program (CIP), which is an annually updated plan of "all programmed parkland acquisition, all major parkland improvement, development and major acquisition of equipment" to be completed over a six-year period. § 2-118 (b). The CIP is submitted to the governing bodies of the two counties which may adopt, amend or modify it after conducting a public hearing. Although the CIP identifies all lands scheduled for acquisition within the six-year period, no allocation of funds for such acquisitions is included in the Commission's annual *4 capital budget beyond those scheduled for the first of the six-year program.
Under § 7-115 (a), the Commission's approval is required before any subdivision plat within the regional district may be recorded in the land records of Montgomery or Prince George's Counties. The Commission is empowered under § 7-116 (a) (4) to prepare subdivision regulations which may provide for
"the reservation of lands for schools and other public buildings and for parks, playgrounds, and other public purposes, provided no reservation of land for traffic, recreation or any other public purposes as herein provided shall continue for longer than three years without the written approval of all persons holding or otherwise owning any legal or equitable interest in the property; and provided further that the properties reserved for public use shall be exempt from all State, county, and local taxes during the period."
Pursuant to the state enabling legislation, Montgomery County adopted an ordinance authorizing the placement of land in public reservation. Under the provisions of the ordinance  § 50-31 (a) of the County Code  the Commission's Planning Board for Montgomery County, which is authorized to administer subdivision regulations in that jurisdiction, is required to "refer all preliminary subdivision plans to the general plan or parts thereof, adopted or proposed or studies related thereto, or shall otherwise determine the need for reserving for public use any of the land included in the preliminary subdivision plan." The ordinance specifies that reservations "for a period of three years may be required for road or street rights of way, public school and building sites, parks, playgrounds or other recreational areas or other public purposes." The ordinance also provides that placement of land in public reservation shall be by resolution of the Commission, which shall state the time, not over three years, that the reservation will be effective.
*5 Under the provisions of the ordinance, property in reservation is exempt from all state, county and local taxes, § 50-31 (a) (3). It is also subject to restrictions on its use, as detailed in § 50-31 (a) (5):
"(5) PRESERVATION. During the reservation period, no building or structure shall be erected upon the land so reserved. No trees, topsoil or cover shall be removed or destroyed; no grading shall be done; no storm drainage structure shall be so built as to discharge water on the reservation except for storm drainage construction in accordance with a storm drainage plan approved by the department of public works or the Washington Suburban Sanitary Commission; nor shall any land so reserved be put to any use whatsoever, except upon written approval of the board. Nothing in this section shall be construed as prohibiting the owner from removing weeds or trash from property so reserved, nor from selling when approved by the board such parts of the land as may be necessary for water, sewer or road right of way for public agencies." (Emphasis added.)
Nothing in the state enabling act, or in Montgomery County's implementing ordinance, obligates the Commission to acquire property placed by it in reservation, either during or at the expiration of the reservation period. No provision is made for payment of compensation to the property owner for the time that his property is held in reservation, whether or not it is ultimately acquired by the Commission.

(2)
Appellees George Chadwick, Jr. and members of his family (the Chadwicks) own a 105-acre tract of land located on the south side of Old Baltimore Road and on the west side of Ten Mile Creek, north of Boyds, Maryland. The property is zoned R-200, which permits one-half acre lots, and has road access by Ten Mile Creek Road. The Chadwicks purchased the property in 1965 as part of a tract containing 159.71 acres. When it was determined, as part of the Clarksburg Master *6 Plan, that approximately 55 acres of the Chadwick tract were within the Commission's park take line for the expansion of Seneca Regional Park and proposed Lake Site No. 3, the Commission placed this acreage in reservation in 1973 with the consent of the Chadwicks. After the expiration of the three-year reservation of the 55-acre tract, the Chadwicks filed a preliminary plan of subdivision for the entire 159-acre tract. The Commission thereupon purchased the 55 acres previously held in reservation.
The Chadwicks thereafter renewed their request for subdivision approval of the preliminary plan for the remainder of the tract; it complied fully with all requirements of law at the time it was presented to the Board on January 26, 1978. The Board's staff recommended that the property be placed in reservation because it was within the Commission's park take line for Little Seneca Regional Park and within the limits of Lake Site No. 3, as shown on the Final Draft Boyds Master Plan.
On April 6, 1978, the Chadwicks' plan of subdivision was denied and the Commission placed the property in reservation for a period not to exceed three years, as authorized by § 50-31 of the County Code. The Commission's action was taken in accordance with the Board's Staff recommendation, and because construction of the dam site at Lake Site No. 3 would flood a portion of Ten Mile Creek Road, in effect denying access to the road serving the proposed subdivision. By the Boyds Master Plan, adopted by the Montgomery County Council on May 9, 1978, the Chadwicks' property was shown to lie within the Commission's park take line and within the limits of Lake Site No. 3. On May 15, 1978, the Montgomery County Council adopted the Commission's CIP, which recommended total acquisition of all lands, including the Chadwicks' property, within the park take line for Little Seneca Regional Park during the succeeding three-year period (Fiscal Years '79, '80, and '81).
On April 25, 1978, the Chadwicks filed suit in the Circuit Court for Montgomery County, seeking the issuance of a writ of mandamus directing the Commission to approve their preliminary subdivision plan, and requesting a declaratory *7 judgment that the reservation of their property and any statute requiring such reservation were unconstitutional as a taking of property without payment of just compensation. The court (McAuliffe, J.) held that the Commission's resolution placing the Chadwicks' property in public reservation under § 50-31 of the County Code was unconstitutional and it ordered the Commission to approve the preliminary subdivision plan. In so concluding, the court noted that the State "may not indefinitely withhold permission for the otherwise permitted development of the land simply because long-range plans provide for different use." It analyzed the Commission's action in terms of its reasonableness as an exercise of police power, and weighed the landowners' deprivation of use of their property against the public interest sought to be served by the restriction. The court found it "crystal clear that [the Chadwicks] have been deprived of all reasonable use of their property during the period of the reservation." It recognized, however, that a total deprivation of use may be reasonable "if for a very limited period of time." It therefore focused upon the period of the reservation, concluding that "a complete deprivation of all use of the property for a period of up to three years constitutes a taking which must be compensated." Because the ordinance did not provide for compensation, the court said that it was unconstitutional "as applied in this case." It specifically refrained from declaring that the ordinance was "wholly unconstitutional" because it believed that it could be employed to authorize a reservation for a time sufficiently short as not to constitute a "taking" in the constitutional sense.
We granted certiorari prior to determination by the Court of Special Appeals of the Commission's appeal to consider the important constitutional issue involved in the case.

(3)
The Commission argues that the placement of private property in a tax-free reservation for up to three years, where the property is located within a master plan's lines for future acquisition as a public park is a legitimate and necessary *8 regulation on private property, and a valid exercise of the police power, which may be imposed without payment of compensation. The Commission suggests that all use of the Chadwicks' property has not been destroyed by placing it in reservation, since under the ordinance the landowners may apply to the Board to use the property for any purpose not inconsistent with the future public use of the land.
The Chadwicks claim that the Commission's action constitutes a taking of all reasonable use of the property for a public benefit without payment of just compensation, in violation of Maryland Constitution, Art. III, § 40, which provides: "The General Assembly shall enact no law authorizing private property, to be taken for public use, without just compensation...."[1] The Chadwicks acknowledge that there may be limited and reasonable applications of the reservation ordinance  reasonableness being determined by the period of time estimated for the completion of acquisition. They maintain that a three-year reservation is an unreasonable period and constitutes a taking of the property since, in their view of the ordinance, the only "right" remaining to them to use their property is to remove weeds and trash from the land.

(4)
The power of the state over private property extends from the regulation of its use and enjoyment under the police power, to its actual appropriation under the eminent domain power upon payment of just compensation. The distinction between the two governmental powers is an important one because a taking for public use without compensation can be corrected by payment, while a governmental action that violates due process requirements may be invalidated, without regard to whether compensation is provided. Our cases have recognized and applied the distinction between a compensable taking under the eminent domain power and a noncompensable regulation under the police power. See, e.g., *9 Governor v. Exxon Corp., 279 Md. 410, 423-38, 370 A.2d 1102 (1977), aff'd, 437 U.S. 117 (1978); Bureau of Mines v. George's Creek, 272 Md. 143, 165-66, 321 A.2d 748 (1974); Rockville Fuel v. Gaithersburg, 266 Md. 117, 127-28, 291 A.2d 672 (1972); Stevens v. City of Salisbury, 240 Md. 556, 563-66, 214 A.2d 775 (1965). We have consistently upheld regulations which may have, as an incidental effect, the diminution of value of property, so long as those regulations have been shown to be fair exercises of the police power. See, e.g., State Dep't of A. & Tax. v. Clark, 281 Md. 385, 380 A.2d 28 (1977); Mont. Co. v. Woodward & Lothrop, 280 Md. 686, 376 A.2d 483 (1977), cert. denied sub nom. Funger v. Montgomery County, 434 U.S. 1067 (1978); Bureau of Mines v. George's Creek, supra; City of Annapolis v. Anne Arundel Co., 271 Md. 265, 316 A.2d 807 (1974); Arnold v. Prince George's Co., 270 Md. 285, 311 A.2d 223 (1973); Potomac Sand & Gravel v. Governor, 266 Md. 358, 293 A.2d 241, cert. denied, 409 U.S. 1040 (1972); Baltimore City v. Borinsky, 239 Md. 611, 212 A.2d 508 (1965). A regulation which prohibits a beneficial use of private property constitutes a fair exercise of the police power if the public interest generally requires it and the regulation is reasonably necessary to achieve the public goal without being unduly oppressive upon individuals. Potomac Sand & Gravel v. Governor, supra. See also Edgewood Nursing Home v. Maxwell, 282 Md. 422, 426, 384 A.2d 748 (1978) (a fair exercise of police power requires a proper public purpose and means which bear a real and substantial relation to the end sought to be achieved without being arbitrary or capricious); Governor v. Exxon Corp., supra; Bruce v. Director, Dep't of Chesapeake Bay Affairs, 261 Md. 585, 276 A.2d 200 (1971). When the State, pursuant to a proper exercise of its police power, regulates the uses to which private property may be put, no compensation need be paid for any diminution in value of property caused by the regulation. Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978); Bureau of Mines v. George's Creek, supra; Arnold v. Prince George's Co., 270 Md. 285, 311 A.2d 223 (1973); Krieger v. Planning Commission, 224 Md. 320, 167 A.2d 885 (1961). However, we have recognized that a *10 governmental action, while not rising to the status of a compensable "taking" of property, may amount to an invalid deprivation of property rights without due process of law, either because the purpose of the action was improper, see, e.g., Hoyert v. Bd. of County Comm'rs, 262 Md. 667, 278 A.2d 588 (1971) (attempt to depress value of property in anticipation of subsequent condemnation); Carl M. Freeman, Inc. v. St. Rds. Comm'n, 252 Md. 319, 250 A.2d 250 (1969) (sole purpose of ordinance is to freeze land values) or because the means chosen were too burdensome on the individual property owner. See, e.g., Spaid v. Board of Co. Comm'rs, 259 Md. 369, 269 A.2d 797 (1970) ("buffer zoning" to establish a border of vacant property around a residential neighborhood). See also Morris County Land I. Co. v. Parsippany-Troy Hills Tp., 40 N.J. 539, 193 A.2d 232 (1963) (valid public purpose cannot be achieved by excessive zoning restriction on use of private property); Jensen v. City of New York, 42 N.Y.2d 1079, 399 N.Y.S.2d 645, 369 N.E.2d 1179 (1977) (plotting all of property owner's land on official street map deprives him of use of property for an indefinite period in violation of due process of law); Fred F. French Inv. Co. v. City of New York, 39 N.Y.2d 587, 385 N.Y.S.2d 5, 350 N.E.2d 381, appeal dismissed, 429 U.S. 990 (1976) (rezoning which deprives owner of reasonable income productive or other private use of property violates due process requirement); Miller v. Beaver Falls, 368 Pa. 189, 82 A.2d 34 (1951) (plotting property for parkland without payment of compensation).
We have also recognized that the State "cannot under the guise of the police power take private property for public use without compensation." Capital Transit Co. v. Bosley, 191 Md. 502, 514, 62 A.2d 267 (1948). In zoning cases, in determining whether the challenged zoning regulation amounts to a taking of private property, we have said that no compensable taking occurs so long as the zoning regulation does not deprive the owner of "all beneficial use of the property." Baltimore City v. Borinsky, supra at 622. Accord, Cabin John Limited Partnership v. Montgomery County Council, 259 Md. 661, 271 A.2d 174 (1970); Montgomery County Council v. Kacur, 253 Md. 220, 252 A.2d 832 (1969). But see Frankel v. *11 City of Baltimore, 223 Md. 97, 162 A.2d 447 (1960) (successful challenge to residential zoning, which was shown to have deprived owner of all reasonable use of his property). Likewise, where a zoning ordinance would force a property owner to destroy or reduce his property at his own expense, we have held that this is a taking. Stevens v. City of Salisbury, supra.
Where the challenged governmental action is not a zoning regulation, the test for determining when a purported "regulation" becomes a compensable "taking" is less clear. See, e.g., Bureau of Mines v. George's Creek, supra at 177 (The effect of the regulation on the usefulness of the land as a whole may be of such magnitude as to constitute a taking for which just compensation must be paid.); Leet v. Montgomery County, 264 Md. 606, 287 A.2d 491 (1972) (Law which required landowner to remove debris dumped on his property by trespassers is a "taking," as it forces property owner to use his own resources to confer a benefit upon the public.) See also Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (To determine if regulation constitutes a "taking," the proper inquiry is to focus on the uses the regulation permits.); Smoke Rise, Inc. v. Washington Suburban San. Comm'n, 400 F. Supp. 1369, 1382 (D. Md. 1975) (When restrictions are placed on private property in order to create a public benefit rather than to prevent a public harm, a compensable "taking" has occurred.). See generally Michelman, F., "Property, Utility, and Fairness: Comments on the Ethical Foundations of `Just Compensation' Law," 80 Harv. L. Rev. 1165 (1967) (Factors to be considered in deciding whether compensation is required include (1) the amount of economic injury to the property; (2) the harmfulness of the land use so restricted; (3) the loss to the property owner as balanced against the gain to the public; (4) any physical use or occupation of the property by the government.); Sax, J., "Takings and the Police Power," 74 Yale L.J. 36 (1964) (If government causes economic loss to property owner as a result of the government's acquisition of resources for its own use, compensation is required.).
Part of the confusion surrounding the attempts to *12 distinguish between a compensable "taking" and a noncompensable "regulation" stems from Mr. Justice Holmes' statement in Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 415, 43 S.Ct. 158, 67 L.Ed. 322 (1922): "While property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." Subsequent cases have used the same terminology in equating an invalid exercise of the regulatory police power with a "taking" or "confiscation" of property, terminology appropriate to the eminent domain power and its concomitant right to compensation when it is exercised. See, e.g., Mont. Co. v. Woodward & Lothrop, supra; Bureau of Mines v. George's Creek, supra; City of Annapolis v. Anne Arundel Co., supra; Lutheran Church in Amer. v. City of New York, 35 N.Y.2d 121, 359 N.Y.S.2d 7, 316 N.E.2d 305 (1974); Miller v. Beaver Falls, supra. In these cases, as in Pennsylvania Coal, there was no actual "taking" under the eminent domain power, despite the courts' use of the terms "taking" and "confiscation," and the regulatory measures were tested for validity as exercises of the police power under the due process clause.

(5)
The present case does not involve a valid exercise of the police power regulating, in the public interest, a mere beneficial use of private property for which compensation need not be paid to the affected landowner. On the contrary, we think the Commission's resolution placing appellees' land in reservation for a period up to three years stripped the landowners, for that extended period of time, of all reasonable use of their property and was tantamount to a "taking" without compensation as the lower court declared. In so concluding, we recognize the commendable governmental objective sought to be achieved by placing the land in reservation but, as was said in Pennsylvania Coal Co. v. Mahon, supra (260 U.S. at 416), "a strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than the constitutional way of paying for the change."
*13 We construe the ordinance under which the Commission acted as not permitting the landowner to make, as a matter of right, any use of the property placed in reservation (other than to remove trash and weeds). We further construe the ordinance as not authorizing the planning board to permit, upon the landowner's application, any use of the reserved property which conflicts with the flat prohibition contained in the ordinance against grading the land, erecting any structures thereon, or removing trees, top soil or other cover. Restrictions of such totality upon the use of property placed in reservation for a three-year period bring this case within the principle, so well illustrated in Pennsylvania Coal, that a governmental restriction imposed on the use of land may be so onerous as to constitute a taking which constitutionally requires the payment of just compensation.
Pennsylvania Coal involved an action to enjoin a coal company from mining under the plaintiffs' residence in such a way as to cause subsidence of the land surface. The company had conveyed the tract to the plaintiffs, reserving the right to remove all the coal under the property. The grantees agreed to take the risk and waive all claims for damages that might arise from the mining of the coal. The plaintiffs maintained that because a Pennsylvania statute subsequently enacted prohibited the mining of coal in any manner that would cause subsidence of any structure used for human habitation, any public structure, public street or passageway, the coal company's right to mine under their residence had been nullified. The Pennsylvania court held that the statute as applied to the company's right to mine coal was a valid exercise of the police power. The Supreme Court reversed that judgment, holding that the statute amounted to an unconstitutional taking of the company's property without payment of compensation in violation of the Fourteenth Amendment. The Court said:
"Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. As long recognized some values are enjoyed under *14 an implied limitation and must yield to the police power. But obviously the implied limitation must have its limits or the contract and due process clauses are gone. One fact for consideration in determining such limits is the extent of the diminution. When it reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain and compensation to sustain the act." 260 U.S. at 413 (italics added).
The Court focused in Pennsylvania Coal on the nature of the interest destroyed by the statute, and concluded that the effect of the law was to give the public a right to subsurface support of structures and streets. This subsurface support, the Court said, must be acquired for the public through the exercise of the eminent domain power, just as surface rights are acquired for public purposes. It concluded that such deprivation of the coal company's property rights for the purpose of providing subsurface support in the public interest could be constitutionally effected only if accompanied by payment of compensation. The Court thus reaffirmed the principle earlier enunciated in Hudson County Water Co. v. McCarter, 209 U.S. 349, 355, 28 S.Ct. 529, 52 L.Ed. 828 (1908), that where regulation would render the property "wholly useless, the rights of property would prevail over the other public interest, and the police power would fail. To set such a limit would need compensation and the power of eminent domain."
Fifty years later, in Penn Central Transp. Co. v. City of New York, 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978), the Court held that New York City's Landmarks Preservation Law, which restricted development of individual historic landmarks, did not effect an unconstitutional "taking" of Penn Central's Grand Central Terminal property. The Court there noted that the law's major theme was to "ensure the owners of any such [designated] properties both a `reasonable return' on their investments and maximum latitude to use their parcels for purposes not inconsistent with the preservation goals." 98 S.Ct. at 2652. Penn Central, prevented by the law from constructing a high-rise office *15 tower atop the Terminal, did not challenge the City's goal of preserving historic structures, or the means chosen to effectuate that goal. Rather, Penn Central's challenge, and the Court's opinion, focused on the nature and extent of the property interest affected by the regulation, in order to determine if the law amounted to a "taking," requiring payment of just compensation.
The Court rejected the proposition "that diminution in property value, standing alone, can establish a taking"; it concentrated instead "on the uses the regulations permit." Id. It concluded that, while the law restricted Penn Central's exploitation of above-surface development rights, it neither impaired the present use of the Terminal, nor appropriated the parcel for city purposes, nor facilitated any entrepreneurial operations of the City. "The Landmarks Law's effect is simply to prohibit appellants or anyone else from occupying portions of the airspace above the Terminal, while permitting appellants to use the remainder of the parcel in a gainful fashion." Id. at 2665. Thus, the Court held that the City had not "taken" the property for its own use, and that therefore the law was not invalid for its failure to provide just compensation.
Considered together, Pennsylvania Coal and Penn Central provide ample guidance for determining whether a governmental restriction on the use of land, sought to be imposed under the police power, is of such magnitude as to constitute a taking in the constitutional sense. As we have indicated, the Commission's resolution placing appellees' land in reservation for a period of up to three years, with no reasonable uses permitted, amounts to a virtual "freeze" on the use of the property in its entirety. The resolution does not merely circumscribe a beneficial use of the property; it inhibits all beneficial use for up to three years, without any guarantee that the property will be acquired in the future. That the Commission's resolution is tantamount to a taking is, we think, clearly buttressed by cases in other jurisdictions.
In Miller v. Beaver Falls, 368 Pa. 189, 82 A.2d 34 (1951), Pennsylvania's Supreme Court invalidated a state law and implementing city ordinance which allowed a municipality to *16 designate private property as parklands for up to three years, but which imposed no duty upon the municipality to acquire the designated property. The enactments provided that no compensation for improvements located on the property after notice was given of its placement in reservation would be paid if the property was subsequently acquired for public use. While the court conceded the desirability of the purpose to be achieved (establishment of parks for public use), it said that the city's action "in plotting the ground for a park or playground and freezing it for three years is, in reality, a taking of property by possibility, contingency, blockade and subterfuge, in violation of the clear mandate of our Constitution that property cannot be taken ... without just compensation having been first made and secured." 82 A.2d at 37.
In Lomarch Corp. v. Mayor of Englewood, 51 N.J. 108, 237 A.2d 881 (1968), the Supreme Court of New Jersey considered a state statute and implementing municipal ordinance similar to § 50-31 (a) of the Montgomery County Code. The state law authorized a municipality to designate land uses upon an official map; it provided that:
"`* * * Upon the application for approval of a plat, the municipality may reserve for future public use the location and extent of public parks and playgrounds shown on the official map, or any part thereof and within the area of said plat for a period of one year after the approval of the final plat or within such further time as agreed to by the applying party. Unless within such one year period or extension thereof the municipality shall have entered into a contract to purchase, or instituted condemnation proceedings, for said park or playground according to law, such applying party shall not be bound to observe the reservation of such public parks or playgrounds....'"
237 A.2d at 882.
The statute permitted the landowner to "use the area so reserved for any purpose other than the location of buildings *17 or improvements" during the reservation period. Id. at 882-83. Pursuant to the state law, the municipality of Englewood placed the landowner's property on the official map of the city and designated it as reserved for use as a park. The court noted that "the practical effect of the ordinance was to `freeze,' for a one year period, any attempt to develop the designated land," despite the fact that the statute contained a "relief provision" which allowed the municipality to permit the construction of buildings, if the owner of the reserved land could show that he could not otherwise receive a "reasonable return" from his property. The court characterized the relief provision as paying "but token service to the landowner's right to use his land...." Id. at 883.
Presuming that the legislature understood that "any attempt to deprive a landowner of the use of his property for one year would be unconstitutional absent an intent to compensate [him]," the court concluded that "the `option' for the purchase of land ... was statutorily granted to the municipality only upon the implied duty and obligation to make payment of adequate compensation to the landowner for the temporary taking and his deprivation of use." Id. at 884. Thus, the Lomarch court viewed the statute as, in effect, an exercise of the eminent domain power that must be accompanied by payment of compensation in order to withstand constitutional challenge. See also Gordon v. City of Warren Plan. & Urb. Renew. Com'n, 388 Mich. 82, 199 N.W.2d 465 (1972); Peacock v. County of Sacramento, 271 Cal. App.2d 845, 77 Cal. Rptr. 391 (1969). Compare Washington Sub. San. Comm'n v. Nash, 284 Md. 376, 396 A.2d 538 (1979); Hoyert v. Bd. of County Comm'rs, 262 Md. 667, 278 A.2d 588 (1971); Carl M. Freeman, Inc. v. St. Rds. Comm'n, 252 Md. 319, 250 A.2d 250 (1969).
The Commission, supported by a well-prepared amicus curiae brief filed by the Attorney General, urges that we apply the rationale of cases like Headley v. City of Rochester, 272 N.Y. 197, 5 N.E.2d 198 (1936), and State v. Manders, 2 Wis.2d 365, 86 N.W.2d 469 (1957), sustaining the constitutionality of so-called official map laws  statutes *18 which establish the location of existing and planned streets and place restrictions on the issuance of permits to build structures in the bed of proposed roadways. These statutes restricting development in the bed of mapped streets contain provisions for variances to assure the landowner of a reasonable return on affected property, including the granting of a building permit to prevent substantial damage accruing to the owner where that course of action is required by justice and equity. Maryland's statute controlling development in mapped streets is similar to those involved in Headley and Manders. See Maryland Code (1957, 1978 Repl. Vol.), Art. 66B, § 6.01 et seq.
The facts of the present case clearly distinguish it from the cited cases involving the reservation of street locations.[2] As in those cases, we recognize the need to promote intelligent planning by placing reasonable restrictions on the improvement of land scheduled to be acquired for public use. We do not, therefore, condemn as beyond the police power the enactment of reservation statutes which are reasonable in their application both as to duration and severity. Our holding today is a narrow one, limited to the facts before us. We conclude only that the Commission's resolution passed pursuant to § 50-31 of the County Code, placing appellees' land in reservation for up to three years, without any reasonable uses permitted as of right, was tantamount to a "taking" in the constitutional sense. Because the Commission's resolution did not provide for the payment of just compensation, it was unconstitutional as applied to the appellees' property and was thus of no effect. Consequently, the trial judge correctly ruled, in accordance with the requested prayer for relief, that the Commission's resolution was a nullity and that the Commission was required to forthwith approve appellees' preliminary subdivision plan.
Judgment affirmed, with costs.
NOTES
[1] That private property may not be taken for public use without the payment of just compensation is also guaranteed by the Fifth Amendment to the Federal Constitution. The federal constitutional protection is applicable to the states through the Fourteenth Amendment. Chicago, B. & Q.R.R. v. Chicago, 166 U.S. 226, 17 S.Ct. 581, 41 L.Ed. 979 (1897).
[2] See, however, Moale v. Baltimore, 5 Md. 314 (1854).