**STATE of Alaska, Appellant,**

v.

**UNIVERSITY OF ALASKA, Appellee.**

No. 4579.

Supreme Court of Alaska.

Feb. 27, 1981.

Barbara J. Miracle and Thomas E. Meacham, Asst. Attys. Gen., and Avrum M. Gross, Atty. Gen., Juneau, for appellant.

Brian J. Farney and Mary Louise Molenda, Abbott, Lynch & Farney, Anchorage, for appellee.

## OPINION

Before RABINOWITZ, C. J., CONNOR, BURKE and MATTHEWS, JJ., and DIMOND, Senior Justice.

CONNOR, Justice.

The principal issue in this case is whether lands that were originally granted to the state by the federal government for the support of the University of Alaska may now be used for other public purposes. The state contends that university lands can be included in Chugach State Park without paying compensation. The superior court held that the inclusion of the university lands in the state park constituted a breach of trust and invalidated the portion of AS 41.20.210 which included the university land in the park. It awarded substantially full attorney's fees to the university.

We conclude that the trial court was correct in holding that it was a breach of a federal trust to include university land in the park without compensation, but we conclude that invalidating the statute was er-

ror. The proper remedy in this case is to award compensation to the university. We also hold that it was improper to award substantially full attorney's fees to the university.

### I. Facts

The facts in this case are not in dispute. A group of real estate developers (Village Developers, *et al.*) wished to build a housing development known as Innsbruck Village. All the proposed land for the development, consisting of about 710 acres, is a privately owned inholding within the boundaries of Chugach State Park. Between this enclave of private land and the park boundary are two sections of land designated as Sections 11 and 14 of Township 15 North Range 1 West, Seward Meridian. In 1961, the state received the patent to the bulk of the land in these two sections [1] from the United States under the authority of the Act of January 21, 1929, ch. 92, 45 Stat. 1091 (1929), which allows the state to select 100,-000 acres of vacant unreserved land from the federal domain for the "use and benefit" of what is now the University of Alaska. This is not land to be used as the site of a university campus; rather, it is an asset of the university to be used for its support through its retention and use or its eventual sale.

The real estate developers wished to widen and reroute a portion of a then existing road that provided the only access into the private land. This road cuts across the two sections of university land. In July, 1977, the developers applied to both the university and the state Department of Natural Resources for permission to do the road work. The university granted its permission in December, but on April 5, 1978, the Department of Natural Resources denied its permission.

At the time the state denied its permission, a survey crew employed by the developers had already been on the road for several days and had cut some trees and brush. On April 12, the state filed a com-

---

1. The remaining land in the sections is private land acquired under homestead entry prior to the state patent.

plaint seeking an injunction halting any further work, a declaratory judgment that the developers were trespassing, and damages.

The developers, in their answer and a motion for partial summary judgment, stated among other defenses and counterclaims that the court should not permit the state to treat the university land as park land. The state, in opposing this contention, maintained that the land belonged to the state, the legislature had included the land in Chugach State Park, and therefore it had to be managed in a manner compatible with park land. The state further took the position that the Board of Regents of the university had no power to force the state to grant a right of way over this land and that the university's permission to the developers had no effect.

At a hearing on the summary judgment motion, the court decided to permit the University of Alaska to intervene as a party. The court was concerned that any decision regarding the relatively minor dispute between the developers and the state over a piece of road construction could have a far-reaching effect on the future management of university lands. When the university intervened as a defendant, it sought a declaratory judgment not only as to the land specifically involved in the road dispute, but also as to the total 5,040 acres of university land included in Chugach State Park.[2]

In a memorandum decision, the trial court concluded, first, that the land granted to the university continued to be retained in trust for the university under the federal grant; second, that by placing the university land in Chugach State Park the state violated the purpose of the trust; third, that under Alaska law, the Board of Regents must be consulted whenever there is a disposition of land, and there was no approval by the Board to place this land in a state park; and forth, that when the Board of Regents seeks a disposal of its land, as was done in this case by approval of

the road building plan, the state Department of Natural Resources must acquiesce, and carry out the disposal as a ministerial duty. The trial court's ultimate conclusion was that the university lands were not part of the Chugach State Park because the legislature's enactment including the lands in the park was invalid. A final order to this effect was entered.

The state has appealed from the court's judgment. After the court entered its final order, the state and the developers settled. The only remaining dispute is between the university and the state.

## II. Violation of Federal Trust

██ The state's principal argument in this appeal is that the grant of 100,000 acres of federal land for the support of higher education in the Territory of Alaska under the 1929 Act is no longer restricted to the narrow purpose envisioned by that Act. While the state recognizes that the 1929 Act originally required university lands to be managed solely for the benefit of the university, the state apparently now believes that these lands may be managed with multiple objectives in mind, some of which may be compatible with the support of the university and some which may not be compatible. It does not believe that the university must be compensated for placing the land in the state park. The state's reasoning is based on the action of Congress, which has repealed certain sections of the original 1929 land grant.

A review of the subsequent history of the 1929 land grant shows that the state's argument is without support. We agree with the trial court that putting university lands into a state park without compensation to the university was a breach of the trust.

### A. The 1929 Act.

The 1929 Act originally consisted of seven sections. The first, which is still in effect, is a habendum clause describing the size of the grant and its purpose. In particular, it

---

2. The university apparently did not sue when Chugach State Park was first created because of uncertainty as to whether university lands within the state park boundaries were to be treated as private inholdings or managed like other park lands.

811

states that the land is granted "for the *exclusive* use and benefit of the Agricultural College and School of Mines" (now the University of Alaska) (emphasis added). Section 2 of the Act, which is also in effect, states that the land grant cannot be used for the support of any religious institution. The remaining five sections, which are now repealed, contained detailed provisions relating to the sale or disposal of land. For example, they required that land be sold to the highest bidder at a public auction, that timber and other products from the land be sold at their appraised value, and that funds derived from the sale of lands be held in trust. Transactions in violation of the Act were "null and void," and the Attorney General of the United States was empowered to enforce the Act.

Language which is nearly identical to that contained in sections 3 through 7 of the 1929 Act appears in sections 10 and 28 of the New Mexico-Arizona Enabling Act, ch. 310, 36 Stat. 557 (1910), which makes grants of extensive amounts of federal land for school purposes to those states. The reason for these provisions in the New Mexico-Arizona Enabling Act was explained by the United States Supreme Court in *Lassen v. Arizona*, 385 U.S. 458, 463–64, 87 S.Ct. 584, 587, 17 L.Ed.2d 515, 520 (1967):

> "All the restrictions on the use and disposition of the trust lands, including those on the powers of sale and lease, were first inserted by the Senate Committee on the Territories. Senator Beveridge, the committee's chairman, made clear on the floor of the Senate that the committee's determination to require the restrictions sprang from its fear that the trust would be exploited for private advantage. He emphasized that the committee was influenced chiefly by the repeated violations of a similar grant made to New Mexico in 1898. The violations had there allegedly consisted of private sales at unreasonably

low prices, and the committee evidently hoped to prevent such depredations here by requiring public notice and sale. The restrictions were thus intended to guarantee, by preventing particular abuses through the prohibition of specific practices, that the trust received appropriate compensation for trust lands." (footnotes omitted).

The nearly identical language used in the grant of land to the Territory of Alaska was undoubtedly placed in the Act to prevent the same kind of abuses by the territorial government.

The State of Alaska acquired the rights to the land granted by the 1929 Act by section 6(k) of the Alaska Statehood Act, Pub.L.No.85–508, 72 Stat. 339 (1958), which provides in relevant part:

> "Grants previously made to the Territory of Alaska are hereby confirmed and transferred to the State of Alaska upon its admission."

Article XII, section 13, of the state constitution provides that any land taken by the state under a federal grant will be accepted under the "terms or conditions of the grants."[3] In *Wessells v. State Department of Highways*, 562 P.2d 1042, 1051 n.34 (Alaska 1977), we recognized that acceptance of grants of school lands under this section created a trust with the state acting as trustee.

### B. The 1966 repeal.

In 1966, the United States Congress repealed sections 3 through 7 of the 1929 Act. Pub.L.No.89–588, 80 Stat. 811 (1966). The state asserts that this repeal means that there are no longer any federal restrictions on the use of the land granted under the 1929 Act. Its principal contention is that the repealing of section 3 of the Act removed any federal trust obligations. Section 3 had provided, in part:

3. The full text of article XII, section 13, provides:

> "*Consent to Act of Admission.* All provisions of the act admitting Alaska to the Union which reserve rights or powers to the United States, as well as those prescribing

the terms or conditions of the grants of lands or other property, are consented to fully by the State and its people."

As 14.40.390 implements the above section, and AS 14.40.400 establishes a trust fund for revenues derived from university lands.

"[I]t is hereby declared that all lands granted to said Territory are hereby expressly transferred and confirmed to the said Territory and shall be by the said Territory held in trust . . . ."

The state concludes that, once this language was repealed, the state could establish its own guidelines for how the land should be used.

The legislative history of the repeal, the history of the school land grants in general and the plain wording of the habendum clause of section 1 make this theory of the state unsupportable.

First, it is abundantly clear from the legislative history that Congress was willing to repeal sections 3 through 7 of the 1929 Act because it was satisfied that Alaska had adequate procedures in its own statutory law to prevent the type of abuses that the repealed sections were designed to prevent. In particular, it should be noted that in its first session in 1959, Alaska's new state legislature enacted a bill that provided for the disposal of public lands and resources along principles nearly identical to those contained in sections 3 through 7 of the 1929 Act. Like the 1929 Act, the state law required that lands and resources be sold to the highest bidder. *See* Ch. 169, art. IV, § 2, and art. VI, § 3, SLA 1959. In floor debates on the bill, Representative Rivers from Alaska was asked by one of his colleagues to clarify that Alaska had adequate procedural safeguards to manage university lands. Because of Alaska statutory law, Representative Rivers could assure him

that such protections existed. It hardly seems possible that Representative Rivers intended to convey the message the state now asserts, that in fact the state would be free to use university lands for any purpose which it saw fit under some broad concept of the "public interest."[4]

Second, the state's argument fails to appreciate that, if Congress had intended to allow land to be used for other than university purposes, this would have signaled a major shift in federal land policy. The statehood enabling acts of at least nine other western states contain allocations of acreage for school trust lands totaling approximately 40 million acres. *See* Note, *Compensation for Highway Easements Over School Trust Lands*, 42 Wash.L.Rev. 912, 912 n.5 (1967). In 1962, Arizona's legislature petitioned Congress to modify is enabling act so that municipalities could use school trust lands for parks, schools and other public purposes and compensate the trust at less than fair market value. Bills introduced by the Arizona congressional delegation failed to pass both houses. *See* Udall, *Arizona's Public Lands—Mixed Blessing, Mixed Burden*, 8 Ariz.L.Rev. 11, 13 (1966). It does not seem reasonable to conclude that Alaska, alone among western states, was to be treated so differently.

Finally, it is clear that the language of the 1929 Act that was not affected by the 1966 repeal continues to impose a trust obligation upon the state. As noted above, the habendum clause, which remains in effect, continues to require that the land be used

---

4. The following conversation took place:

"Mr. HALL: I see no objection to the land of a land-grant college or university, or otherwise, being sold to the highest bidder. Does the gentleman mean to inform me directly that the laws of the State of Alaska now care for this, in lieu of the Federal restrictions? Mr. RIVERS of Alaska: Yes; and it is so stated in the report, which says that the change by the Congress would not be immediately effective because conforming legislation is still in effect or being considered by the State. . . . Mr. HALL: Mr. Speaker, I believe the gentleman knows I am a "States' righter" in most areas, and I believe in the 10th Amendment to our Constitution. If he is implying to me

that the State of Alaska now has inherent in its own code and laws the fact that it will make sales at public auction, and that they will maintain necessary restrictions for the protection of the State university and the State of Alaska—that is all I need.

. . . . . .

Mr. RIVERS of Alaska: Mr. Speaker, I will say that the State will impose its own appropriate restrictions. But I must also say that the present law allows the sale of university lands by sealed bids as well as by public auction. With that one modification, I warrant all that the gentleman requires. Mr. HALL: Mr. Speaker, I withdraw my reservation."

112 Cong.Rec. H. 21,749 (1966).

for the "exclusive use and benefit" of the university.

## C. The trust violation.

■ Because the land was to be held in trust for the university, we must determine whether inclusion of the land in Chugach State park caused a breach of the trust. The trial court concluded that the inclusion of university land in the park violated the trust provision of the federal grant. We agree. The use that can be made of park lands as compared to state lands in general is severely restricted. Trees may not be cut, minerals may not be removed, nor can the land be used for raising farm animals. The general principle is that park lands are to be managed in a way that will increase "the value of a recreational experience."[5] It is apparent that this objective is incompatible with the objective of using university land for the "exclusive use and benefit" of the university. The implied intent of the grant was to maximize the economic return from the land for the benefit of the university. This intent cannot be accomplished if the use of the land is restricted to any significant degree.

■ It is well established in private trusts that "[i]t is the duty of a trustee to administer the trust solely in the interest of the beneficiaries." II A. Scott, The Law of Trusts § 170, at 1298 (3d ed. 1967). *See* G. Bogert, The Law of Trusts and Trustees § 541, at 157 (rev. 2d ed. 1978). *Lassen v. Arizona,* 385 U.S. 458, 87 S.Ct. 587, 17 L.Ed.2d 515 (1967), makes clear that the same private trust law principles are to apply to federal land granted to the states for school purposes.[6] *Lassen* involved the question of whether and how much compensation must be paid by a state when it uses school lands for a highway right of way.

The Court noted that the enabling act granting the school land "unequivocally demands ... that the trust receive the full value of any lands transferred from it...." 385 U.S. at 466, 87 S.Ct. at 588, 17 L.Ed.2d at 521. Further, the intent of Congress was that "the grants provide the most substantial support possible to the beneficiaries and that *only* those beneficiaries profit from the trust." 385 U.S. at 467, 87 S.Ct. at 589, 17 L.Ed.2d at 522 (emphasis added).[7] As noted in a more recent Supreme Court case, *Alamo Land & Cattle Co. v. Arizona,* 424 U.S. 295, 302, 96 S.Ct. 910, 915, 47 L.Ed.2d 1, 8

**5.** 11 AAC 18.010 provides:
"On public lands located within the boundaries of a state park, surface or subsurface mineral (including gravel and rock) exploration or extraction, removal or cutting of timber or other plant growth, grazing or pasturing of domestic animals, or other activities which do not increase park values or which do not add to the value of a recreational experience are incompatible uses and are prohibited without a permit from the director. The director shall issue a permit if he determines that the
(1) ecology of state park lands will not be irreparably damaged or imperiled;
(2) state park lands are protected from pollution;
(3) public use values of the state park are maintained and protected; and
(4) public safety, health and welfare will not be damaged or imperiled."

**6.** At least two courts have specifically concluded that the law of private trusts is applicable to land held by the state in trust for schools. *See Keys v. Carter,* 318 So.2d 862, 864 (Miss.1975); *State v. Rosenberger,* 187 Neb. 726, 193 N.W.2d 769, 773 (1972). As discussed in the text, the acceptance by Alaska of university

lands created a trust. *Wessells v. State Dept. of Highways,* 562 P.2d 1042, 1051 n.34 (Alaska 1977). The state has apparently recognized that at least as to funds derived from university lands, private trust law applies. *See* 1963 Op. Att'y Gen.No.13 (Alaska May 31, 1963), which liberally cites private trust law authorities in determining the proper management of the fund created by AS 14.40.400. The state offers no explanation why the lands granted to the university should be treated differently from funds derived from them, and we cannot find any logical reason why they should be.

**7.** It is clear in both these quoted passages that the Court reached this conclusion by examining those provisions of the New Mexico-Arizona Enabling Act which, like former sections 3 through 7 of the 1929 Act, provided for detailed procedures for maximizing the profit from the disposal of land. However, as discussed in detail above, repeal of those sections in the Alaska act was not meant to change this policy. It was only meant to allow the state to use its own similar procedures. Therefore, the language in *Lassen* is equally applicable to this case.

(1976), the ultimate conclusion of *Lassen* is that "even where the State itself is the acquisitor, the Act's designated beneficiaries were to derive the full benefit of the grant." [8]

The state conjectures that there may still be an economic return from these lands because at some point in the future the Department of Natural Resources may allow ski tows or concession stands to be placed on them. The Supreme Court in *Lassen* rejected this type of speculation about the possible future value of land. The Arizona Supreme Court had concluded that it was safe to presume that a highway always increases the value of adjacent lands in an amount equal to the value of the right of way that has been taken. The United States, as amicus curiae, had suggested that, instead of using a presumption, any compensation paid into a trust be reduced by any proved enhancement. The Supreme Court rejected both arguments and concluded that the school trust had to be compensated for the actual appraised value of the land taken.

From the foregoing discussion, we conclude that the state has breached the trust by not compensating it for the value of the university land included in the park. The appropriate remedy is discussed in detail below.

### III. Legislature's Power to Dispose of University Lands

■ As discussed above, the trial court concluded that the disposal of university land without compensation violated a trust created by the 1929 Act. The court further concluded, however, that the state legisla-

ture had no power to dispose of university land without the express permission of the Board of Regents. The court reasoned that AS 38.05.030(a) prevents any disposal of university lands by the Commissioner of Natural Resources without the approval of the Board of Regents, and, because this was a disposal of land without the Board's approval, it was invalid.

While we agree with the trial judge's conclusion that this was a "disposal" of land, we conclude that AS 38.05.030(a) only covers disposals of land by the Commissioner of Natural Resources.[9] The creation of Chugach State Park was a disposal by the legislature, not by administrative action, and therefore AS 38.05.030(a) is inapplicable.

■ The university argues, on the basis of article VII, section 2, of the Alaska Constitution, that the legislature cannot control university land. That section provides:

"The University of Alaska is hereby established as the state university and constitutes a body corporate. It shall have title to all real and personal property now or hereafter set aside for or conveyed to it. Its property shall be administered and disposed of according to law."

The trial court concluded:

"The apparent intention of the framers of the Constitution was to insure that the University had legal title to all land and property actually utilized by it in its educational capacity."

This is a reasonable interpretation of the section, and in fact the legislature has given

---

8. Of all the states that received federal land grants for schools in their enabling acts prior to *Lassen* only Arizona, *Arizona Highway Dept. v. Lassen*, 99 Ariz. 161, 407 P.2d 747 (1965); and to a limited extent Wyoming, *Ross v. Trustees of Univ. of Wyo.*, 222 P. 3 (Wyo.1924), *aff'd on rehearing*, 31 Wyo. 464, 228 P. 642 (1924); had concluded that a public purpose use of school lands did not require compensation to a school trust fund. *See State ex rel. Galen v. Dist. Court*, 42 Mont. 105, 112 P. 706 (1910); *State ex rel. Johnson v. Central Neb. Pub. Power & Irrigation Dist.*, 143 Neb. 153, 8 N.W.2d 841 (1943); *State Highway Comm'n v. Walker*, 61 N.M. 374, 301 P.2d 317 (1956); *State Highway*

*Comm'n v. State*, 70 N.D. 673, 297 N.W. 194 (1941); Note, *Compensation for Highway Easements over School Trust Lands*, 42 Wash.L. Rev. 912, 913 n.6 (1967).

9. AS 38.05.005–.040 governs the administration of public lands by the Commissioner of Natural Resources. AS 38.05.030(a) provides in part:

"The sale, lease or other disposal of university lands shall be made by the commissioner .... No sale, lease, exchange or other disposal of university lands may be made without the approval of the Board of Regents of the University of Alaska."

title to lands in the area of the Fairbanks campus to the university. Ch. 182, § 3(c), SLA 1978. Moreover, the university takes any land it may have title to "according to law." As the state points out, only the legislature can make laws effecting the disposal of land, not the Board of Regents,[10] so even if the university did have title to the land, the legislature would still be empowered to dispose of it.[11] The only veto power the Board of Regents has over disposals of land is defined by statute. Consequently, we believe that the legislature was free to dispose of this land without obtaining the approval of the university. In any event, as the federal patent makes clear, the state, not the university, was the grantee.

The natural resources article of the Alaska Constitution grants extensive powers to the legislature to control state lands. Article VIII, section 2, provides that

"The legislature shall provide for the utilization, development, and conservation of all natural resources belonging to the State, including land and waters, for the maximum benefit of its people."

It is clear that these lands "belong" to the state. Additionally, article VIII, section 7,

provides for reserving from the public lands areas which have recreational value.

■■■ The university objects to this interpretation of the natural resources article which allows the legislature wide latitude of control over its lands. It contends that it allows politics to intrude into the management of university affairs. However, if the trust fund for university lands is fully compensated at the appraised value of the property, as *Lassen* requires, it is difficult to imagine how the legislature can have any impact on university policy or academic freedom.[12]

Thus we hold that the legislature had the power to dispose of the land in question.

### IV. Remedy

■■■ The trial court held that the portions of AS 41.20.210(11) which included university land in the park were invalid, and rejected the remedy of inverse condemnation and either monetary damages for the taking of the university land or an exchange of lands having an equal fair market value. In the trial court's view, the remedy of inverse condemnation would result in the judiciary "injecting itself unnecessarily into the political sphere" and could force an unanticipated allocation of resources by the state.[13]

---

**10.** *See* Alaska Const., art. XII, § 11. Terms such as "according to law" refer to the legislature's power to make laws.

**11.** Nebraska has apparently concluded that its legislature does not have the power to make direct disposals of land. *See State ex rel. Johnson v. Central Neb. Pub. Power & Irrigation Dist.*, 143 Neb. 153, 8 N.W.2d 841, 848 (1943). However, the Nebraska Constitution specifically provides for a method of management and disposal of school lands. The Alaska constitution has left these determinations to the legislature.

**12.** The university suggests that, by enacting AS 41.20.210, creating Chugach State Park, there was an implied repeal of AS 38.05.030(a). This is not a logical or necessary construction. AS 41.20.210 withdrew the particular university land involved from the operation of the management mechanism created by AS 38.05.-030(a) and AS 14.40.170(4), which grants certain management powers to the Board of Regents. The university also has sought a declaration that when the Board of Regents wishes to dispose of university land granted to the state under the 1929 Act the Commissioner of Natural Resources must carry out the disposal.

In this case, it is clear that the requested disposal was not made by the Department of Natural Resources because the land had been included in the state park. There is no reason to assume that this is a general problem or that there is a likelihood of a recurring controversy concerning the issue if the university is compensated. Therefore, we do not believe the issue is ripe for review. *See Jefferson v. Asplund*, 458 P.2d 995, 999 (Alaska 1969) (regarding declaratory judgments).

**13.** One commentary argues that inverse condemnation should not be an available remedy when the state's taking is a purely nonphysical, regulatory one. The only remedy that should be available, according to this view, is declaratory or injunctive relief invalidating the statute; otherwise, legislatures would become reluctant to try new approaches to land use problems because the state or municipality might suddenly find itself liable for numerous damage claims. This would not occur if the law were merely declared invalid. Furthermore, invalidating the law leaves it to the legislature to determine whether it wishes to reenact a similar law with the certain knowledge that it will now have to pay something for it. Permitting

While there is some merit to the argument in the context of a private damage action, we believe that it is inapplicable in this case. If damages are awarded here, it will, at the most, involve a transfer of either lands or funds from one governmental entity to another. Moreover, the legislature has nearly total control over appropriations to the university. Thus, there is no issue of the allocation of resources between the private and public sectors.

It is also logical to assume that the legislature intended to compensate the university for the loss of its land. This view gives the statute creating Chugach State Park a reading that is in accord with the well recognized canon of statutory construction that, when possible, legislation should be construed in a way that upholds its validity. *See* 1 C. Sands, Sutherland Statutory Construction § 2.01 (4th ed. 1972).

The New Jersey Supreme Court based a decision on this rationale in *Lomarch Corp. v. Mayor of Englewood*, 51 N.J. 108, 237 A.2d 881 (1968). Rather than declare a statute that provided for reserving private land for parks invalid, the court concluded that the statute should be construed in such a way that it required compensation, even though the statute and a municipal ordinance enacted under it did not mention the subject. *Cf. Maryland-National Capital Park & Planning Commission v. Chadwick*, 286 Md. 1, 405 A.2d 241, 250 (1979) (striking down a plan similar to New Jersey's on the ground that the regulation constituted a taking and was therefore unconstitutional in that it failed to award any compensation). We do not decide whether we will follow *Lomarch* in an action by a private property owner [14] but we do find its reasoning appropriate in this case where no private damage actions are involved.

Thus, it is necessary to remand this case to determine the value of the lands taken. We conclude that the university should receive the full appraised value of the land

that was placed in the park. The applicable date on which the fair market value of the land should be determined is the date the Chugach State Park act was enacted. This is in accordance with our holding that the statute which created Chugach State Park required compensation, and with our decision in *City of Anchorage v. Nesbett*, 530 P.2d 1324, 1334–36 (Alaska 1975). Finally, we believe the parties should be given an election to pay monetary damages or arrange a mutually agreeable land exchange.

## V. Attorney's Fees

Following judgment, the university moved in the superior court for an award of $16,196.00 in attorney's fees incurred in defending the underlying action. The court granted a partial award of $15,000.00. The state raises numerous objections to the court's award of attorney's fees: that the university waived its right to recover attorney's fees by failing to comply with the requirements of Civil Rule 79(a) that a cost bill be filed within ten days of judgment, and by failing to set forth the charges incurred with sufficient particularity; that the court's award of substantially full attorney's fees was unreasonable and an abuse of discretion; and that one state agency should not be ordered to pay attorney's fees to another state agency.

■ Initially, the state argues that the trial court erred in refusing to apply the requirements of Civil Rule 79(a) to the university's request for attorney's fees. Civil Rule 79(a) provides in part:

"Within 10 days after the entry of judgment, a party entitled to costs shall serve on each of the other parties to the action or proceeding a cost bill, together with a notice when application will be made to the clerk to tax costs. The cost bill shall distinctly set forth each item claimed in order that the nature of the

---

an inverse condemnation action places the allocation of public resources into the hands of the private litigants. Note, *Inverse Condemnation: Its Availability in Challenging the Validity of a Zoning Ordinance*, 26 Stan.L.Rev. 1439 (1974).

14. As noted, *Lomarch* involved compensation to private property owners.

charge can be readily understood.... Failure of a party to serve a cost bill and notice as required by this subdivision shall be construed as a waiver of his right to recover costs."

The state contends that the university waived its right to recover attorney's fees by its failure to comply with the requirement that a cost bill be served within ten days of judgment. The university filed its request for attorney's fees in the superior court thirteen days after judgment. The trial court ruled that it would be unfair to treat any delay in filing the motion for attorney's fees as a waiver (citing Civil Rule 94), given the established position of the superior court in the Third Judicial District that the procedures in Rule 79 do not govern Rule 82 motions for attorney's fees.

We have never directly addressed the question of whether a request for attorney's fees is governed by the procedural requirements of Rule 79. However, on two occasions we have intimated that Rule 79 does not govern attorney's fees, by considering the issue of attorney's fees after holding that the right to recover costs was waived for failure to establish compliance with Rule 79(a). *See Curran v. Hastreiter*, 579 P.2d 524 (Alaska 1978);[15] *M–B Contracting Co. v. Davis*, 399 P.2d 433 (Alaska 1965).

We conclude that, while attorney's fees are costs,[16] they are not covered by the literal requirements of Civil Rule 79(b).[17]

 It is within the discretion of the trial court to impose a time limit for the filing for attorney's fees. The trial court did not abuse its discretion in this case by permitting the request thirteen days after the judgment.

 When granting attorney's fees, the trial court indicated that the amount requested by the university, $16,196.00, was reasonable due to the high quality and extensive nature of the work required, but it felt constrained by this court's decisions to grant only a partial award. The state contends that the amount awarded, $15,000.00, provides "substantially full attorneys fees" and is per se unreasonable. In *Moses v. McGarvey*, 614 P.2d 1363, 1370 (Alaska 1980), we stated that "complexity may be considered in determining the amount to be awarded, but that factor alone does not justify the award of full fees."

We have consistently held that an award of full attorney's fees is "manifestly unreasonable" in the absence of a bad faith defense or vexatious conduct by the losing party. *E. g., Davis v. Hallett*, 587 P.2d

15. *Curran* states:
"Although appellees specify as error the superior court's failure to award both costs and attorney's fees, they request that the case be remanded only for a determination of attorney's fees. There is no indication in the record that appellees complied with Civil Rule 79(a) which requires a party seeking costs to serve on each of the other parties within 10 days after entry of judgment 'a cost bill, together with a notice when application will be made to the clerk to tax costs.' The rule also provides that '[f]ailure of a party to serve a cost bill and notice as required by this subdivision shall be construed as a waiver of his right to recover costs.' Thus, appellees have apparently waived their right to costs. *See M–B Contracting Co., Inc. v. Davis*, 399 P.2d 433, 436–37 (Alaska 1965). In *M–B Contracting*, after invoking Rule 79(a) to bar consideration of an appeal as to costs, this court considered the separate issue of attorney's fees."
579 P.2d at 530 n.20.

16. AS 09.60.010 provides:

"Except as otherwise provided by statute, the supreme court shall determine by rule or order what *costs, if any, including attorney fees*, shall be allowed the prevailing party in any case." (emphasis added).

17. Alaska R.Civ.P. 79(b) reads:
"*Items Allowed as Costs.* A party entitled to costs may be allowed premiums paid on and expenses of posting, undertakings, bonds or security stipulations, where the same have been furnished by reason of express requirement of law or on order of the court; the necessary expense of taking deposition for use at trial and producing exhibits; the expense of service and publication of summons or notices, and postage when the same are served by mail; filing fees and other charges made by the clerk of the court and fees for transcripts required in the trial of a case in the superior court. In addition to the items allowed as costs by law and in these rules, a party shall be allowed any other expenses necessarily incurred in order to enable a party to secure some right accorded him in the action or proceeding."

**818**

1170, 1171–72 (Alaska 1978); *Malvo v. J. C. Penney Co.*, 512 P.2d 575, 587 (Alaska 1973). In *Stepanov v. Gavrilovich*, 594 P.2d 30, 37 (Alaska 1979), an award of substantially full attorney's fees was held to be "contrary to the philosophy expressed in *Malvo....*"

The attorney's fees awarded the university are over ninety per cent of what it requested, and there is no evidence that the state's claim was frivolous, vexatious or devoid of good faith. The award is excessive and must be reduced on remand.[18]

Finally, the state suggests that the court is precluded from awarding attorney's fees when both parties are state entities, claiming that the fees will ultimately come from the same fund. This argument was not presented to the superior court, and therefore it need not be considered. In any event, the argument is without merit. The university is a corporation of independent authority established by the Alaska Constitution, article VII, sections 2 and 3. It has the statutory power to "sue and be sued" in its own name, AS 14.40.040; and it is "an instrumentality of the sovereign which enjoys in some limited respects a status which is co-equal rather than subordinate to that of the executive or the legislative arms of government." *University of Alaska v. National Aircraft Leasing, Ltd.*, 536 P.2d 121, 128 (Alaska 1975) (footnote omitted). Attorney's fees would be paid out of segregated appropriations given to each entity. Each entity has an interest in preserving its own funds, and the university, as the prevailing party, is entitled to an award of fees.

In conclusion, we affirm the trial court's decision that the inclusion of university lands in Chugach State Park by statute, without compensation to the university, was a breach of the federal trust. We hold, however, that the court erred in invalidating the statute. The proper remedy is to permit an award in inverse condemnation.

We also hold that the court erred in awarding substantially full attorney's fees against the state.

AFFIRMED in part, REVERSED in part, and REMANDED.

BOOCHEVER, J., not participating.

---

**18.** The state also argues that the university failed to comply with the requirements of Rule 79(a) that a cost bill "distinctly set forth each item claimed in order that the nature of the charge can be readily understood." On remand, the university should provide the state and the court with more complete records, including brief descriptions of the services included.