Vern T. WEISS, Father and Next Friend of Carl Weiss, on Behalf of Himself and all Others Similarly Situated; and Mary C. Nanuwak and Billy R. Cross, on Behalf of Themselves and all Others Similarly Situated, Appellants,

v.

STATE of Alaska, Anita Bosel, Frances Doulin, Sharon Goodwin and Gabriel Mayoc; and H.L., M.K., and Alaska Addiction Rehabilitation Services, Appellees.

No. S–6845.

Supreme Court of Alaska.

May 2, 1997.

David T. Walker, Law Offices of David T. Walker, Juneau, and James B. Gottstein and Bruce A. Moore, Law Offices of James B. Gottstein, Anchorage, for Appellants.

Brian D. Bjorkquist and Nathaniel B. Atwood, Assistant Attorneys General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, Julian L. Mason and William S. Cummings, Ashburn & Mason, Anchorage, and G. Thomas Koester, Law Office of Thomas Koester, Juneau, for Appellee State of Alaska.

James H. Parker, Disability Law Center of Alaska, Anchorage, for Appellees Bosel, Doulin, Goodwin and Mayoc.

Philip R. Volland, Rice, Volland, Taylor & Hensley, P.C., Anchorage, for Appellees H.L., M.K. and Alaska Addiction Rehabilitation Services.

Before COMPTON, C.J., and RABINOWITZ, EASTAUGH and FABE, JJ.

## OPINION

FABE, Justice.

### I. INTRODUCTION

Vern T. Weiss et al.[1] (Weiss) appeal from the superior court's approval of an agreement settling a class action lawsuit concerning the lands granted to Alaska under the Alaska Mental Health Enabling Act, Pub.L. No. 84–830, § 202, 70 Stat. 709, 711–712 (1956) (AMHEA). The settlement agreement, reached after almost a decade of negotiations, reconstitutes the trust with land and cash and establishes institutional mechanisms to protect the trust and improve mental health programs. For the reasons set forth below, we conclude that the superior court did not err in determining that the agreement represents a fair, adequate, and reasonable settlement of this litigation.

### II. FACTS AND PROCEEDINGS

#### A. The 1956 Act, the Redesignation Legislation, and State v. Weiss

We summarized the facts and proceedings in this case prior to 1985 in State v. Weiss, 706 P.2d 681 (Alaska 1985):

In 1956 the United States Congress passed the Alaska Mental Health Enabling Act (AMHEA) which, insofar as it concerns this case, granted the Territory of Alaska one million acres of federal land to be held in public trust to help effectuate the creation and operation of mental health care facilities in Alaska. Pub.L. No. 84–830, 70 Stat. 709 (1956). Section 202(e) of the Act specifically provides:

*All lands granted* to the Territory of Alaska under this section, together with the income therefrom and the proceeds from any dispositions thereof, *shall be administered by the Territory of Alaska as a public trust* and such proceeds and income shall first be applied to meet the necessary expenses of the mental health program of Alaska. Such lands, income and proceeds shall be managed and utilized in such manner as the Legislature of Alaska may provide. Such lands, together with any property acquired in exchange therefor or acquired out of the income or proceeds therefrom, may be sold, leased, mortgaged, exchanged, or otherwise disposed of in such manner as the Legislature of Alaska may provide in order to obtain funds or other property to be invested, expended or used by the Territory of Alaska. The authority of the Legislature of Alaska under this subsection shall be exercised in a manner compatible with the conditions and

---

1. Mary C. Nanuwak also joins this appeal. Billy R. Cross appeals from the superior court's denial of a motion to substitute him as a named plaintiff-intervenor for John Martin after Martin died in 1994.

requirements imposed by other provisions of this Act. (emphasis added)

The state managed these lands without maintaining a separate account until 1978. The Alaska State Legislature made its practice law in 1978 when it passed the following statutory provision:

REDESIGNATION AND DISPOSAL OF MENTAL HEALTH LAND

(a) Land granted to the state under the Mental Health Enabling Act of 1956, 70 Stat. 709, and patented to or approved for patent to the state on July 1, 1978 and land designated as mental health land which was received by the state in exchange for land granted under that federal land grant is redesignated as general grant land and shall be managed and disposed of by the Department of Natural Resources under applicable provisions of law.

Ch. 181, § 3(a), SLA (1978).

Alaska has provided continuous mental health care since statehood....

Weiss et al. filed a class action in 1982 alleging that the state breached the public trust by 1) failing to account for revenues realized, 2) using revenues for purposes other than mental health care and 3) passing legislation redesignating the property "general grant land." Plaintiffs sought declaratory relief invalidating the redesignation legislation; injunctive relief compelling the state to administer the trust according to the law; general relief establishing a trust account "for the receipt of funds generated from all lands selected by the State of Alaska under the aforesaid mental health land grant...."

State v. Weiss, 706 P.2d at 681–82.

The superior court agreed with plaintiffs that the State breached its duties as trustee by removing the federal grant lands from the trust. Id. at 682. However, the trial court ruled that it could not invalidate the 1978 redesignation legislation. Id. Instead, it ordered the State to pay fair market value and interest for all lands conveyed from the trust, including the lands redesignated general grant lands. Id. The superior court also

ordered a set-off against this payment "for all monies spent by the state on mental health care." Id.

On appeal, we affirmed the lower court's ruling that Congress created a trust under the AMHEA and that the State breached its duties as trustee. Id. at 683. As a remedy for this breach, we invalidated the redesignation legislation and remanded the case to the trial court to reconstitute the trust "to match as nearly as possible the holdings which comprised the trust when the 1978 law became effective." Id. at 684. We also provided the trial court with the following guidance:

Those general grant lands which were once mental health lands will return to their former trust status. In the event exchanges have been made, those properties which can be traced to an exchange involving mental health lands will also be included in the trust. To the extent that former mental health lands have been sold since the date of the conveyance the trust must be reimbursed for the fair market value at the time of sale. In calculating the total amount owed, the trial court should grant a set-off for mental health expenditures made by the state during the same period. In the event that expenditures exceeded the value of lands sold, the state need not furnish cash as part of the reconstitution. The goal is to restore the trust to its position just prior to the conveyance effected by the redesignation legislation.

Id. at 684. We left open, however, "questions regarding the title held by conveyancees and bona fide purchasers of mental health lands." Id. at 684 n. 4.

At the time of our decision in Weiss, only about thirty-five percent of the original trust land remained in state ownership and unencumbered. The State had conveyed about 90,000 acres to private individuals and municipalities and had designated more than 350,000 acres for parks, forests, wildlife areas, and similar uses.

Upon remand, we permitted the Alaska Mental Health Association (AMHA) et al.[2]

2. Mary C. Nanuwak and John Martin joined AMHA's complaint.

(collectively, AMHA Intervenors) to intervene. The AMHA Intervenors added claims seeking to invalidate many of the State's conveyances of trust land to third parties.

### B. *Chapter 48 and Chapter 210*

The legislature established the Interim Mental Health Trust Commission (Trust Commission) in 1986. Ch. 132, SLA 1986. It gave the Trust Commission the power to approve proposals for the sale, lease, or exchange of mental health trust land and to make recommendations for resolving the litigation. *See* Ch. 132, §§ 2(d), 4, SLA 1986.

One year later, based on discussions among all parties, the legislature attempted to settle the litigation by adopting Chapter 48, SLA 1987 (Chapter 48). Chapter 48 directed the commissioner of natural resources to establish the fair market value of the original trust lands under procedures approved by the Trust Commission. Ch. 48, § 4(a), SLA 1987. Once the Trust Commission established the fair market value of the lands, the commissioner, with the approval of the Trust Commission, was to select a combination of original trust lands and lands within legislatively designated areas with a fair market value equal to that of the original trust. Ch. 48, § 4, SLA 1987. The State would then compensate the trust for its use of these lands by paying it a "rent" of eight percent of the fair market value. Ch. 48, § 2, SLA 1987. Chapter 48 also provided that, until the fair market value of the trust land was established, the State would pay the trust five percent of unrestricted general fund revenues annually. Ch. 48, § 11, SLA 1987. Finally, the legislation created the Alaska Mental Health Board to determine the needs of persons to be served by the mental health program and to transmit recommendations for services and funding to the governor and legislature. *See* Ch. 48, § 6, SLA 1987.

During enactment of Chapter 48, other plaintiff groups moved to intervene in the action. The superior court permitted Anita Bosel *et al.*[3] (Bosel Intervenors) to intervene on behalf of developmentally disabled individuals,[4] and H.L. *et al.*[5] (H.L. Intervenors) to intervene on behalf of chronic alcoholics with psychoses. AMHA and Weiss opposed the addition of the Bosel Intervenors. After an examination of the legislative history of the AMHEA, the superior court in 1988 concluded that Congress intended to benefit developmentally disabled individuals as well as those suffering from a psychiatric illness who may require hospitalization (Beneficiary Decision). The superior court also concluded that beneficiaries of the trust included chronic alcoholics suffering from psychoses and senile individuals who suffer major mental illnesses as a result of their senility.

In December 1989 two of the three members of the Trust Commission estimated the fair market value of the original trust lands to be $2.243 billion. The third member, the delegate of the commissioner of natural resources, rejected this figure and estimated the value of the original trust lands to be about $565 million. In response to these conflicting valuations, the commissioner of natural resources declared an "impasse" and refused to implement Chapter 48. In 1990 the legislature enacted a different proposal under which the State would pay six percent of unrestricted general fund revenues annually to the trust. Ch. 210, § 2, SLA 1990. This solution, which avoided the issue of the fair market value for the original trust land, foundered due to opposition by plaintiffs who feared revenues would fall.

During this period of negotiations, the State continued to convey original trust land. However, after the failure of Chapter 48, the plaintiffs obtained a preliminary injunction prohibiting the State from transferring trust lands or any interest in trust lands pending final resolution of the litigation. In addition, the plaintiffs refiled *lis pendens* on all origi-

---

3. Frances Doulin, Sharon Goodwin, and Gabriel Mayoc also joined in Bosel's complaint.

4. We use the term "developmentally disabled" to refer to those individuals labeled "mentally re-

tarded" and "mentally defective" in early versions of the AMHEA and in the record.

5. M.K. and Alaska Addiction Rehabilitation Services joined in H.L.'s motion to intervene.

nal trust lands.[6] The injunction and *lis pendens* affected thousands of land transactions.

### C. *Chapter 66*

At the end of the 1991 legislative session, the legislature again attempted to settle the litigation by enacting Chapter 66, SLA 1991 (Chapter 66). Chapter 66 established a procedure to reconstitute the mental health land trust entirely through a land exchange. Under its provisions, the trust would retain much of its original holdings, and plaintiffs would be allowed to nominate replacement land of equal value from other state land. Chapter 66 also created a new agency, the Alaska Mental Health Trust Authority (Trust Authority), to act as trustee. Ch. 66, § 10, SLA 1991. The proposed settlement incorporating Chapter 66 was signed by the State and three of the four attorneys representing the plaintiffs, but the legality of the settlement was challenged by intervenors representing development and environmental interests. In addition, the H.L. Intervenors opposed the settlement, alleging improprieties in the negotiations.[7]

On December 30, 1993, the superior court denied preliminary approval of the Chapter 66 settlement. The superior court found that, because "either party may terminate the agreement at any time for any reason," the settlement was seriously deficient and could not be approved without modification. Following this ruling, the State informed the parties that it did "not intend to implement the reconstitution provisions of Chapter 66." Instead, the State moved forward with a new approach to ending the litigation.

### D. *HB 201*

After renewed negotiations between the parties, the legislature enacted the core of the settlement now before us in a special session following the regular 1994 legislative session. Ch. 5, 6, FSSLA 1994. Known as HB 201, the legislation returned about 568,000 acres of original land to the trust and designated approximately 353,000 acres of other state land as substitute trust land. The reconstituted trust now includes about 435,000 acres held in fee, 55,000 acres of mineral estate, and 78,500 acres of oil and gas interests from the original trust corpus. Other state land placed in the trust includes 111,000 acres held in fee, 217,000 acres of mineral estate, and 25,000 acres of oil and gas interests. The entire reconstituted trust consists of about 930,000 acres.

HB 201 provides for a special unit in the Department of Natural Resources (DNR) to manage trust land. AS 44.37.050. The settlement requires DNR to manage the land "consistent with the trust principles imposed on the state" by the AMHEA. AS 38.05.801. In addition, DNR must manage the land "under those provisions of law applicable to other state land" and adopt regulations that "at a minimum" address: "(1) maintenance of the trust land base; (2) management for the benefit of the trust; (3) management for long-term sustained yield of products from the land; and (4) management for multiple use of trust land." AS 38.05.801(c).

The settlement also provided for a payment by the State of $200 million in cash. Ch. 6, FSSLA 1994. This cash payment, proceeds from the sale of trust land, and other proceeds attributable to principal are retained perpetually in the mental health trust fund and invested by the Alaska Permanent Fund Corporation. AS 37.14.031–.035. The income from the fund, the land, and other assets is deposited in the mental health trust settlement income account. AS 37.14.036. The Trust Authority may use this income account to award grants and contracts to ensure an integrated mental health program, obtain grants and gifts for that purpose, pay the Department of Natural Resources and the Alaska Permanent Fund Corporation for managing trust assets, offset the effect of inflation on the value of the principal of the trust, and pay its administrative expenses. AS 37.14.041.

HB 201 also requires the Trust Authority to make recommendations on mental health

---

6. The plaintiffs originally filed a notice of *lis pendens* on all original trust land prior to our decision in *Weiss*. This notice was expunged by the superior court on November 15, 1984.

7. Although the Bosel Intervenors joined the agreement, they later withdrew their support.

spending to the governor and legislature. AS 47.30.046. The appropriation bill submitted by the governor and the appropriation bill passed by the legislature must be limited to the mental health program. AS 37.14.003(a) & .005(b). The bills must be accompanied by reports explaining any differences between the appropriations they contain and the Trust Authority's recommendations. AS 37.14.003(b) & .005(c). In addition, the governor must explain any vetoes of appropriations for the mental health program "in light of" the Trust Authority's recommendations. AS 37.14.003(c).

The legislature made portions of the settlement contingent on dismissal of the litigation on or before December 15, 1994. Ch. 5, §§ 48–51, FSSLA 1994. If the superior court had not approved the settlement and dismissed the suit on or before that date, the trust would have been reconstituted with only the lands included in the settlement agreement; the provisions for payment of $200 million, establishment of the Trust Authority, and the special budgeting procedures would not have taken effect. *Id.*

The State and the H.L. and Bosel Intervenors (collectively, Proponents) supported HB 201, while the AMHA Intervenors and Weiss opposed it. After a four-day evidentiary hearing, the superior court gave preliminary approval to the HB 201 settlement on July 29, 1994.

In granting preliminary approval, the superior court noted several problems with the settlement that might have precluded final approval. Some of these were addressed by a second special session of the legislature. Chs. 1–2, SSSLA 1994. The legislature amended the settlement to allow for the provisions of HB 201 to go into effect even if some members of the class appealed final approval after the December 1994 deadline. Ch. 1, § 2, SSSLA 1994. It also modified the list of lands incorporated into HB 201 to avoid title problems and include more valuable lands. Ch. 1, §§ 4–7, SSSLA 1994. Fi-

nally, it gave assurance that the trust would receive the full $200 million in cash even if the State could not sell certain lands for the amount stated in the legislation. Ch. 2, §§ 4–5, SSSLA 1994.

After reviewing comments and conducting another evidentiary hearing on the fairness of the settlement, the superior court issued final approval of the HB 201 settlement on December 6, 1994. Weiss appeals.[8]

## III. DISCUSSION

### A. Standard of Review

 In reviewing the superior court's approval of a class action settlement pursuant to Alaska Rule of Civil Procedure 23(e),[9] we adopt the same abuse of discretion standard applied under the federal rule, 7B Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice and Procedure* § 1797.1, at 394 (1986), and in our previous cases concerning settlement agreements. *E.g. Barber v. Barber*, 837 P.2d 714, 716 n. 2 (Alaska 1992). We review the superior court's findings of fact under the clearly erroneous standard. *Id.*

### B. Did the Superior Court Err in Ruling that the Settlement Agreement Is Fair, Adequate, and Reasonable?

In granting final approval, the superior court properly focused on determining whether the settlement as a whole was fair, adequate, and reasonable. The superior court listed seven factors to consider in making this determination:

(1) comparison between the likely result of litigation and the remedy in the settlement;

(2) expense, complexity, and likely duration of further litigation;

(3) reaction of the class to the settlement, number of objectors, and nature of objections;

---

8. Earl Hilliker, an original plaintiff, and AMHA opposed the settlement but are not participating in this appeal.

9. Rule 23(e) provides:

(e) Dismissal or Compromise. A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs.

(4) experience and views of counsel;

(5) defendant's ability to pay (feasibility of settlement);

(6) extent of discovery completed; and

(7) presence of collusion in settlement negotiations.

This list of factors, drawn from federal precedent, provides a framework for thorough analysis. *See Class Plaintiffs v. City of Seattle,* 955 F.2d 1268, 1291 (9th Cir.1992); *Manual for Complex Litigation, Third* § 30.42 (1995); 2 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 11.43, at 11–97 (3d ed. 1992).

■ The bulk of Weiss's arguments concern the fairness of the settlement; he argues, in short, that it is a "bad deal." As the United States Supreme Court has stated, "[c]ourts judge the fairness of a proposed compromise by weighing the plaintiff's likelihood of success on the merits against the amount and form of the relief offered in the settlement." [10] *Carson v. American Brands, Inc.,* 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 998 n. 14, 67 L.Ed.2d 59 (1981). Thus, the focus of Weiss's challenge is the superior court's analysis under the first factor above: the comparison between the likely result of litigation and the remedy in the settlement. In making this comparison, a court should attempt to determine

> a range of reasonableness with respect to a settlement—a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion—and the judge will not be reversed if the appellate court concludes that the settlement lies within that range.

*Newman v. Stein,* 464 F.2d 689, 693 (2d Cir.1972).[11]

The superior court determined that the HB 201 settlement "provide[d] the class with five primary benefits." These included reconstitution of the trust with $1.1 billion of original and replacement land, payment of $200 million, establishment of the Trust Authority, alteration of the budgeting process, and creation of a special DNR unit to manage trust land.[12] The superior court compared these benefits to what it determined would be the likely result of continued litigation: a trust composed solely of between $1.2 and $1.5 billion worth of land. It reasoned that, because the set-off for the State's mental health expenditures permitted under *Weiss* would probably exceed the value of the payment for lands removed from the trust, further litigation would not result in any cash payment to the trust. It also concluded that continued litigation would not result in any Program Benefits.

Weiss challenges this comparison, arguing in essence that the superior court erred both by overvaluing the settlement and undervaluing the probable outcome of continued litigation.

1. *Land value*

The settlement provides for the trust to be reconstituted with both original trust land and substitute land. The superior court, for purposes of comparison, valued the combination of original trust land and substitute land in the HB 201 settlement at $1.1 billion. The court then compared this value with the value of the original trust lands without the land that would probably not be returned to the trust after further litigation. Considering the outcomes of both highly successful and unsuccessful litigation, the superior court determined that the value of the land returned to the trust after final judgment would be between $1.16 billion and $1.53 billion.

Weiss argues that the superior court erred in two general ways: (a) it undervalued original trust land and overvalued settlement land; and (b) it incorrectly assessed the risks

---

**10.** In addition, neither the superior court in considering the settlement nor this court in reviewing it "decide[s] the merits of the case or resolve unsettled legal questions." *Carson v. American Brands, Inc.,* 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 998 n. 14, 67 L.Ed.2d 59 (1981).

**11.** We remanded for an equivalent analysis in an appeal involving the proposed settlement of the claims of a minor under Alaska Civil Rule 90.2. *In re Estate of Brandon,* 902 P.2d 1299, 1310 (Alaska 1995).

**12.** The latter three are referred to collectively as the "Program Benefits."

of further litigation. The former involves primarily issues of fact regarding the various efforts to appraise the value of the lands at issue, while the latter centers on the nature of the trust established by the AMHEA.

### a. *Value of original trust and settlement lands*

Weiss's arguments concerning the valuation of the original trust lands focus on the mineral values of those lands.[13] The starting point for the superior court's consideration of the mineral values was the testimony of Weiss's expert, Dr. Paul Metz. Dr. Metz estimated the mineralized lands to be worth between $1.3 and $1.5 billion, exclusive of coal and industrial minerals. The Proponents attacked this estimate through the testimony of four expert witnesses. Applying their "corrections" to Dr. Metz's work, these witnesses testified that the value of the mineral portion of the original trust lands was between $80 and $119 million, or approximately ten percent of Dr. Metz's estimate.

Considering this conflicting testimony, the superior court found that Dr. Metz "overstate[d]" the true value of the mineral lands." It concluded that, although the settlement land "is not as valuable as the original mental health trust," the difference in value suggested by Dr. Metz's appraisal was not "a real dollar loss." This conclusion undercut Weiss's position in two ways. First, it suggested that the other benefits of the settlement, such as the $200 million in cash and the establishment of the Trust Authority, would be adequate compensation for land not returned to the trust. Second, it supported the superior court's conclusion that Weiss faced a "very high litigation risk" of proving that the State owed as much as he claimed for the lands it removed from the trust.

Weiss faults the superior court for failing to provide sufficient analysis of the expert testimony on mineral valuation and for ignoring rebuttal testimony. This argument is unpersuasive. The superior court specifically explained the analysis of each of the four experts critical of Dr. Metz's methodology. It also noted several of Dr. Metz's arguments in rebuttal. Contrary to Weiss's argument, the trial court's decision provides "a clear understanding of the ground on which the trial court reached its decision," *Sloan v. Jefferson*, 758 P.2d 81, 86 (Alaska 1988), and reflects a detailed analysis of both sides of the valuation issue.

■ Weiss also argues that the superior court erred by not accepting Dr. Metz's appraisal of the original trust lands. This argument fails for two reasons. First, the trial court in fact largely adopted Weiss's estimates in making its comparison between the settlement and the probable result of continued litigation, explicitly stating that the "valuations given by Dr. Metz are useful when comparing two groups of mineralized land." Second, a trial court does not err simply by finding the testimony of one witness more convincing than that of another. *Evans v. Evans*, 869 P.2d 478, 480–81 (Alaska 1994).

In arguing that the superior court overvalued the settlement lands, Weiss contends that, because only land "no one maintained an objection to was included" in the settlement, the "posited surface values should . . . be reduced" to a fraction of their stated value. However, Weiss never argued and no witness testified to the trial court that such a reduction should be applied only to lands included in the settlement. Thus the trial court did not err by failing to reduce the value of the land as Weiss suggests.

### b. *Risks of continued litigation*

In assessing the likely result of continued litigation with regard to land, the superior court divided the land in the original trust into categories and assigned each category a "litigation risk."[14] The categories in dispute

---

**13.** Weiss also contends that the superior court erred in valuing the surface value of original trust lands by considering that "the time required to sell surface value original trust lands (called 'absorption') reduced the value to as much as one-tenth to one-fifth of [the lands'] stated value." The superior court, however, did not apply absorption or discount rates when establishing the value of original trust lands; it used the valuation of the land provided by Weiss's expert. Thus, this argument is irrelevant.

**14.** In evaluating this risk, the superior court focused on the probability that plaintiffs would be

are: (i) land held by third-party purchasers; (ii) municipality entitlements; (iii) legislatively designated areas (LDAs) and lands transferred to other state agencies; and (iv) pre–1978 disposals.[15]

### i. *Third-party purchasers*

The superior court concluded that the litigation risk of recovering land purchased by third parties would be very high. It reasoned that the land conveyed to third parties would probably be considered "sold" under *Weiss*. It also determined that, because most of the purchasers did not buy the land with knowledge of the breach of trust, these sales would probably be upheld under basic principles of trust law.[16] The trial court further noted that such purchasers might also raise other valid defenses, such as the statute of limitations.

Weiss argues that this analysis is incorrect. He asserts that under "a long-standing *per se* rule ... conveyances of federal trust lands in breach of trust are void, regardless of the actual state of knowledge of the conveyees." Weiss supports this position by citing cases from Nebraska and Arizona dealing with land granted by Congress to states for the purpose of supporting public schools.

This argument is not persuasive. The trial court reasonably interpreted *Weiss* as supporting the view that land transferred to third parties would be considered "sold" for purposes of reconstituting the trust. It also did not err in concluding that under the *bona fide* purchaser doctrine many if not most of these sales would be valid because the purchasers had neither actual nor constructive notice of any breach of trust.

■ Precedent relied on by Weiss involving school land trusts in Nebraska and Arizona does not contradict this conclusion. The holdings in those cases rely on the detailed procedures for disposal of trust land contained in the enabling acts and state constitutional provisions governing those land trusts. *E.g. Gladden Farms, Inc. v. State*, 129 Ariz. 516, 633 P.2d 325, 327–30 (1981); *Murphy v. State*, 65 Ariz. 338, 181 P.2d 336, 353–54 (1947); *State ex rel. Ebke v. Board of Educ. Lands & Funds*, 154 Neb. 244, 47 N.W.2d 520, 522–23 (1951). The AMHEA differs from these laws because it explicitly permits trust lands to "be sold, leased, mortgaged, exchanged, or otherwise disposed of in such manner as the Legislature of Alaska may provide." AMHEA § 202; *see also State v. University of Alaska*, 624 P.2d 807, 815 n. 11 (Alaska 1981) (noting that the Nebraska Constitution specifically provides for a method of management and disposal of school lands, while the Alaska Constitution "has left these determinations to the legislature"). While we noted in *Weiss* that precedent involving school trust land supported our reliance on "basic trust law principles," *Weiss*, 706 P.2d at 683 n. 3, this reliance does not imply that application of such principles yields the same result regardless of the nature of the trust at issue. The superior court properly applied basic principles of trust law under the specific terms of the AMHEA to determine that the plaintiffs would face a

able to recover the land removed from the trust through further litigation. Under *Weiss*, the State would be liable to the trust for the fair market value of "sold" lands. *Weiss*, 706 P.2d at 684. As discussed below, however, any payment by the State for "sold" lands would be subject to the "set-off." *Id.* Therefore we, like the superior court, address the likely amount of such payment in connection with our discussion of the set-off and focus here on the likelihood that the trust would recover its original land grant.

**15.** The superior court also determined that the litigation risk of recovering trust lands exchanged with the Cook Inlet Region Incorporated was "low." The parties do not dispute this finding. The superior court also briefly considered original trust lands that currently generate

about $1 million a year in revenue from coal leases, concluding that these lands would "clearly return" to the trust in continued litigation.

**16.** The superior court cited *Restatement (Second) of Trusts* § 284 (1959), which states:

(1) If the trustee in breach of trust transfers trust property to, or creates a legal interest in the subject matter of the trust in, a person who takes for value and without notice of the breach of trust, and who is not knowingly taking part in an illegal transaction, the latter holds the interest so transferred or created free of the trust, and is under no liability to the beneficiary.

(2) In the Restatement of this Subject such a transferee is called a "bona fide purchaser."

high risk of recovering land conveyed to many third-party purchasers.

### ii. *LDAs and land transferred to other state agencies*

The superior court estimated that the litigation risk that the trust will recover land set aside by the legislature for other uses since 1978 would be "high." The court based this conclusion on its determination that, in accord with *State v. University of Alaska,* 624 P.2d 807 (Alaska 1981), these lands would probably be deemed "sold" under *Weiss.* Weiss argues that the term "sold" in *Weiss* does not refer to lands "still held by the State."

In *University of Alaska,* we considered a 1929 grant of 100,000 acres by the federal government to the Territory of Alaska for the "exclusive use and benefit" of the University of Alaska. 624 P.2d at 810–11. The State, without paying compensation, placed about 5,000 acres of the land into Chugach State Park. *Id.* at 809–10. We concluded that the State breached the trust by redesignating the land, but declined to invalidate the State's action. *Id.* at 814–15. Instead, we held that the State must compensate the university for the land by paying it fair market value or by agreeing to a land exchange. *Id.* at 816.

In *Weiss,* we distinguished *University of Alaska* on the grounds that the 1978 redesignation legislation did "not involve a disposition of a portion of trust lands for a specific use" and therefore could not support an inference of legislative intent to pay for the trust land. *Weiss,* 706 P.2d at 684. However, unlike the 1978 redesignation legislation, the State's transfer of land to legislatively designated areas or for the use of state agencies is "a disposition of . . . trust lands for a specific use." *Id.* The State's action with respect to such land is thus similar to the action permitted under *University of Alaska.* The superior court therefore reasonably concluded that, under that case, the plaintiffs would face a high risk of not recovering this land through further litigation.

### iii. *Municipal entitlements*

The superior court evaluated the litigation risk associated with recovery of original trust lands selected by municipalities under the municipality entitlement program, AS 29.65, as "medium." It based this conclusion partly on its evaluation of the argument that the transfers would be upheld under *University of Alaska* and partly on the fact that many of the lands have been resold to individuals who may be *bona fide* purchasers. Weiss argues that this finding is contradicted by *City of Sierra Vista v. Babbitt,* 129 Ariz. 524, 633 P.2d 333, 334 (1981), in which a sale of school trust land to a municipality was invalidated.[17] In contrast to the case before us, however, *City of Sierra Vista* relies on the specific requirement in the Arizona Enabling Act that school trust lands be sold to the "highest and best bidder." *Id.* Therefore, Weiss's reliance on this case is misplaced.

Weiss also argues that the superior court erred by including sales by municipalities to third-party purchasers in this category because those sales had already been considered by the court in its specific discussion of sales to third-party purchasers. However, the superior court's finding that the plaintiffs face a "medium" risk of recovering municipal entitlement lands through continued litigation is amply supported by *University of Alaska* regardless of whether such lands were resold to third parties.

### iv. *Pre–1978 disposals*

The superior court evaluated the plaintiffs' risk of recovering lands disposed of prior to the 1978 redesignation legislation as "very high." The court reasoned that because "[n]othing in *Weiss* would require that they be included in the reconstituted trust,"[18] the "plaintiffs would have to prove a breach of trust or other invalidity other than the enact-

---

17. Weiss also argues that the municipalities could not claim *bona fide* purchaser status since they did not pay value for the land. This argument, even if true, is irrelevant because the court did not base its finding on the *bona fide* purchaser status of the municipalities.

18. We stated in *Weiss* that the goal on remand was "to restore the trust to its position just prior to the conveyance effected by the redesignation legislation." *Weiss,* 706 P.2d at 684.

ment of the redesignation legislation." It concluded that, under *University of Alaska* and the legislature's power under the AM-HEA to dispose of trust lands, the plaintiffs would be unlikely to succeed in forcing the State to return this land. Weiss contends that the plaintiffs would have little difficulty in establishing that the pre–1978 transfers were in breach of trust.

The lands disposed of prior to 1978 include both purchases by third parties and land designated for other uses. As discussed above, the trial court reasonably found the risk of recovering land in these two categories as "very high" and "high," respectively. This analysis applies with equal force to the pre–1978 disposals. Thus the superior court did not err in its evaluation of the risk with respect to recovering this category of land.

### c. *Summary of litigation risk with respect to land*

In summary, the superior court did not err in concluding that the likely result of continued litigation would be a trust corpus including land worth between about $1.1 billion and $1.5 billion. Nor did the court err in estimating, for purposes of comparison, the value of settlement lands as about $1.1 billion. The superior court ably analyzed the complex land valuation issues in this case; its findings and conclusions are well supported by both the record and the relevant authority.

### 2. *Cash*

The superior court considered the settlement's $200 million "cash infusion" to be "extremely significant" because it assured "some income" for Trust Authority programs and because "it is real money in hand today." The trial court stated that "$200 million of mineral value may never produce $1 of income for the trust, because the mineral values are based on probabilities of discovery

derived from extremely limited geophysical, geochemical, and geological data with no actual drilling." The superior court also stated that, based on calculations by an expert witness for the Proponents, $200 million in cash is equal to the net present value of the royalties from between $588 million and $6.3 billion in annual mineral production, depending on one's assumptions regarding cost of production, discount rate, mine life, and delay in the start of production.[19]

Weiss complains that these comparisons led the trial court to overemphasize the value of the cash component of the settlement. He argues that the court's statement that $200 million in mineral value might not produce any income for the trust "represents a fundamental misunderstanding of the valuation process."

While Weiss is correct that mineral lands valued at $200 million could presumably be sold for $200 million "cash in hand," his argument misses the superior court's point that the capacity of the trust land to produce income is highly speculative. Contrary to Weiss's assertions, these comparisons and calculations were not presented as "one of the fundamental underpinnings" of the superior court's analysis, but merely as an "interesting" way to contrast the speculative value of the trust's land with the certain value of cash. The superior court did not err by observing this distinction or by illustrating it.[20]

### 3. *The set-off*

The issue of the set-off goes to the heart of the nature of the trust created by the AM-HEA. In *Weiss*, we stated:

> To the extent that former mental health lands have been sold since the date of the conveyance [redesignation legislation] the trust must be reimbursed for the fair market value at the time of sale. In calculat-

---

**19.** The $588 million figure is based on immediate production, a 10% discount rate, a mine life of 20 years, and a royalty payment of four percent of gross production. The $6.3 billion figure is based on a 10–year delay in production, a 20% discount rate, a mine life of 20 years, and a royalty stream of four percent of gross production.

**20.** Weiss offers his own calculations purporting to show that the court's conclusions are "very far off the mark." These calculations, while mathematically correct, ignore the court's assumptions regarding start-up delay, discount rate, and mine life. Thus they do not provide a meaningful point of comparison.

ing the total amount owed, the trial court should grant a set-off for mental health expenditures made by the state during the same period. In the event that expenditures exceeded the value of lands sold, the state need not furnish cash as part of the reconstitution.

706 P.2d at 684. The superior court considered the "setoff ... a very significant litigation risk" with the "potential to negate any cash recovery to the trust resulting from the State's obligation to pay for 'sold' land." It reasoned that neither we nor the United States Supreme Court would be likely to review and reverse our decision in *Weiss*. It also noted that the language of the AMHEA supports its assessment of the risk created by the set-off because it "appears to allow the proceeds of [land] sales to be used for the necessary expenses of the mental health program."

Weiss counters that our statement in *Weiss* allowing the set-off was merely the product of a dubious and unauthorized stipulation made by plaintiff's original counsel. Weiss argues that the making of such a stipulation amounted to "inadequate representation" by class counsel and that class members will therefore not be bound by the resulting settlement agreement.

Weiss's argument rests on the assumption that the set-off, at least as understood by the superior court, is an erroneous interpretation of *Weiss* and the AMHEA. Relying on our holding in *Weiss* that the State, by passage of the 1978 redesignation legislation, "breached its duty to preserve the corpus" of the trust, *Weiss*, 706 P.2d at 683, he concludes that we rejected the State's view that it had the power to spend trust principal to fund the mental health care program. He argues that the superior court should have interpreted *Weiss* as endorsing his position that the State has a duty to preserve the trust corpus against "diminution."

■ We disagree. The AMHEA provides that trust lands "may be sold, leased, mortgaged, exchanged, or otherwise disposed of in such manner as the Legislature of Alaska may provide in order to obtain funds or other property to be invested, expended, or used by the Territory of Alaska." AMHEA § 202(e). The superior court reasonably interpreted this language as expressly permitting the State to fund mental health programs by selling trust assets. Thus the trial court did not err in reasoning that the AMHEA probably does not require that the State preserve the corpus of the trust *in perpetuity*. Nor is this reasoning contradicted by any duty under basic trust law principles. Trustees have a duty to preserve trust property for the uses of the trust,[21] but they do not necessarily have a duty to maintain the corpus of the trust forever.[22]

21. The *Restatement (Second) of Trusts* § 176 (1959), under the heading "Duty to Preserve the Trust Property," states: "The trustee is under a duty to the beneficiary to use reasonable care and skill to preserve the trust property." Comment b of § 176 further states that "[i]t is the duty of the trustee to use reasonable care to protect the trust property from loss or damage." Thus the duty to preserve the trust corpus does not prohibit the trustee from using the principal for the purposes of the trust. Indeed, trusts may allow the trustee to expend the principal of the trust for the support of the beneficiary, under specific terms of the trust, or at the trustee's discretion. *See, e.g., Restatement (Second) of Trusts*, §§ 153–55, 190 (1959).

22. The school trust land cases do not compel a different result. As noted above, the enabling acts, constitutional provisions, and statutes governing many school trust lands, in contrast to the AMHEA, expressly require the state to preserve the corpus of the trust in an " 'inviolate' permanent fund." Sally K. Fairfax *et al., The School*

*Trust Lands: A Fresh Look at Conventional Wisdom*, 22 Envtl.L. 797, 879 (1992). One possible benefit of the settlement is that it establishes such a permanent trust fund for the mental health trust. *See* AS 37.14.031. In view of the language of the AMHEA, it is unlikely that further litigation would achieve this result.

Moreover, Weiss undercuts his own position that the State's duties with regard to the mental health trust are similar to the duties of other states toward school land trusts by arguing that the State breached its duty as trustee by failing to manage the trust's mineral lands so as to produce income to fund the mental health program. The use of royalties from nonrenewable resources to fund mental health programs would necessarily diminish the corpus of the trust. In recognition of this, states with school land trusts usually place mining royalties into permanent funds or use them to purchase additional trust land. *See* Sally K. Fairfax *et al., The School Trust Lands: A Fresh Look at Conventional Wisdom*, 22 Envtl.L. 797, 879 (1992). Indeed, under the settlement agreement, "royalty proceeds" are

In light of the provisions of the AMHEA, general trust principles, and our approval of a set-off in *Weiss,* the superior court did not err in concluding that plaintiffs would face a significant risk that a set-off for the State's mental health expenditures "has the capacity to destroy any affirmative cash recovery regardless of how many lands are determined to have been 'sold.'"

### 4. *The mismanagement claim*

Weiss argues that even if the trial court correctly found that the set-off would exceed any cash recovery for lands removed from the trust, it erred by not adequately assessing the plaintiffs' claim against the State for damages from the State's alleged mismanagement of the trust. Weiss argues that, according to *Restatement (Third) of Trusts, Prudent Investor Rule* § 205 (1990), a trustee who commits a breach of trust is "chargeable with the amount required to restore the values of the trust estate and trust distributions to what they would have been if the trust had been properly administered." Weiss concludes that the superior court erred by finding "significant risks" that damages from this mismanagement or "lost opportunity" claim would not exceed the set-off. He also argues that the superior court abused its discretion by refusing to allow his expert to testify on the likely amount of mismanagement damages.

The superior court agreed with Weiss that "it is very likely that the plaintiffs could prove that the State mismanaged the trust." It found, however, that the plaintiffs would face significant risks both in proving damages in excess of the set-off and in overcoming potential legal defenses. This conclusion is well supported by both the relevant law and facts of this case. In this regard, the trial court stated:

> Lost opportunity damages are difficult to prove in any case unless there is an existing history of business activity or earnings. They would be extremely difficult to prove in this case.
>
> The most difficult area of proof concerns the mineral lands. Almost nothing is actually known about the mineral producing

placed in the permanent fund containing the

capacities of these lands. The lands were open for mineral development and staking for free from the time they were in state control until after the Supreme Court's decision in *Weiss.* Accordingly, the proof would center on what would have happened with proactive promotion of the lands. However, there is no appropriate comparative standard. Throughout this period no group in this state actively promoted mineral lands. Thus, it is hard to predict how the mineral industry would have reacted to active management. Even if the plaintiffs overcome this hurdle, they would have to prove how much money they would have earned from producing mines. Alaska has not had a very active metallic mineral industry, other than for the production of gold. There is a substantial risk that the plaintiffs would be left with speculative damages for which they could be awarded nothing.

The easiest area to prove, lost opportunity damages concerning the surface lands, still poses litigation risks. There are proof problems there as well. The years from 1966 (when selections were largely completed) to 1978 were growth years for the state, but most of the growth occurred in the latter part of that period with the building of the Transalaska pipeline. The plaintiffs could have difficulty showing a market for lands before 1975.

The superior court also found that portions of the mismanagement claim were subject to several legal defenses putting "some if not all of the potential damages from the lost opportunity claim at risk." It noted that the plaintiffs either approved or did not object to many of the transactions between 1986 and 1990 approved by the Interim Mental Health Trust Commission. In addition, the preliminary injunction sought by plaintiffs has precluded the State from "permitting any activity on trust lands without court approval." Thus the trial court concluded that the State "could probably defeat most claims after 1986 based on waiver."

The superior court also found that the mismanagement claim might be barred by

trust's cash principal. AS 37.14.031(b)(2).

"limitations placed by the court on the intervention by AMHA." The mismanagement claim was added to this litigation by the complaint in intervention filed by AMHA after we issued our decision in *Weiss.* This court's order permitting AMHA's intervention stated that "counsel for AMHA declared its general satisfaction with the decision in *Weiss,* and its present desire only to participate in future proceedings in *Weiss* on the previously ordered remand thereof." Under this order, the trial court granted AMHA's request to file its complaint "only insofar as the Additional Claims relate directly to the reconstitution of the trust ordered by the Alaska Supreme Court" in *Weiss.* Referring to these orders permitting AMHA's intervention, the superior court stated that an "independent claim for damages may exceed that limitation." In light of this analysis, we hold that the superior court did not err in its evaluation of the plaintiffs' mismanagement claim.

Weiss also argues that the trial court abused its discretion by refusing to allow Weiss's expert to testify on the likely amount of mismanagement damages. Our review of the transcript, however, reveals that the excluded testimony arose after a new attorney took over examination of the expert during direct testimony. As a condition for allowing the switch in attorneys, the court required the witness's further testimony to be within the scope of the prior testimony. The trial court did not abuse its discretion in ruling that the scope of the prior testimony did not include the calculation of damages due to the State's alleged mismanagement of the trust.

### 5. *Program Benefits*

In comparing the settlement with the likely result of continued litigation, the trial court considered three "primary benefits" in addition to land and cash. These benefits, collectively referred to as the "Program Benefits," include (a) the creation of the Trust Authority, (b) budgeting advantages for the mental health program, and (c) the management of trust land by a special unit within DNR. Weiss argues that the superior court overvalued each of these benefits.

### a. *The Trust Authority*

The superior court found the Trust Authority to be a "fundamental and significant part" of the settlement agreement. Weiss argues that the benefit of the Trust Authority is largely "illusory" because its power to spend money from the trust income account without appropriation by the legislature is possibly unconstitutional. Weiss also contends that the power of the Trust Authority to oversee DNR's administration of trust lands is meaningless since DNR will have "the final say."

In granting both preliminary and final approval, the superior court recognized that the constitutionality of the Trust Authority's power to spend trust income without legislative appropriation was uncertain. Thus, contrary to Weiss's assertion, the superior court did not "just close its eyes" to this issue. Indeed, it would have been improper for the trial court to attempt to resolve this unsettled legal question. *See Carson v. American Brands, Inc.,* 450 U.S. 79, 88 n. 14, 101 S.Ct. 993, 998 n. 14, 67 L.Ed.2d 59 (1981). Furthermore, the court based its finding as to the significance of the Trust Authority on "all its powers and its advocacy position," not solely on its spending power.[23] Thus the superior court, even while acknowledging Weiss's argument, came to a different conclusion as to the Trust Authority's value; this conclusion was not clearly erroneous. Weiss's second argument also fails. Again, the superior court recognized and accounted for the fact that, although the Trust Authority has the power to disapprove proposed land exchanges, DNR will ultimately decide how to manage trust land. *See* AS 37.14.009(a)(2).

---

**23.** The superior court emphasized its view of the importance of the Trust Authority's "advocacy position":

> The Trust Authority, if it does its job, will serve as a watchdog to ensure that neither DNR nor the legislature mismanages these trust lands again.... [I]t is clear that the sometimes powerless have been empowered. The Trust Authority can be a powerful advocate for the real needs of those who have so much difficulty advocating for themselves.

Moreover, the superior court responded to both of these arguments with the observation that, without the settlement there "would be no Trust Authority." Instead, the likely result of litigation would be "general directions to the State to manage the trust in the interests of the beneficiaries and under the Enabling Act." The superior court did not err in determining that management under the Trust Authority will probably be better than "management with those directions."

### b. *Budgeting advantages*

The superior court found that the budgeting procedures in HB 201, set forth at AS 47.30.046 and AS 37.14.003–.005,

> may prove to be significant as the budget for the integrated comprehensive mental health program competes with other needs for general fund appropriations. The mental health budget is given an advantage for inclusion in the governor's budget over the budgets of other state agencies. The mental health budget is given an advantage before the legislature both from its separation from other appropriations and in the required legislative report. Clearly, there are no guarantees of adequate funding or expanded funding for necessary services, but these budget advantages may prove to be significant nonetheless.

Weiss argues that the superior court erred in not quantifying the benefit of these "budgeting advantages." It would make little sense, however, to require the trial court to quantify the value of such terms; as the court recognized, their significance remains to be seen. However, like the Trust Authority, the budgeting advantages would almost certainly not be established through continued litigation. Therefore, the superior court did not err in considering these procedures a benefit, albeit of unknown value, to the class.

24. Weiss also argues briefly that the superior court erred by not reducing the value of settlement land because of the settlement's management regime. This argument assumes that the State's management under the settlement will be different than the management resulting from continued litigation. As discussed below, the court did not err in refusing to accept this assumption.

### c. *Land management*

Weiss makes several interrelated arguments with regard to the land management provisions of the settlement agreement. First, he contends that the management regime is "illegal" because it allegedly does not require trust lands to be managed "solely in the best interest of the beneficiaries." Weiss also asserts that the court erred by considering the "not very concrete" benefit of management of trust land by a special DNR unit.[24]

Weiss argues that the settlement's management scheme is illegal because it provides that DNR "shall manage mental health trust land under those provisions of law applicable to other state land." AS 38.05.801(b)(1). This argument is unconvincing. HB 201 explicitly makes this provision subject to the overall requirement that the lands "be managed consistent with the trust principles imposed" by the AMHEA. AS 38.05.801(a). In light of this express language, the trial court reasonably concluded that the settlement's management standard conforms with the requirements of the trust.

Weiss also argues that the management provisions are illegal because they require that DNR's regulations "address ... management for multiple use of trust land." We agree with the superior court, however, that when "viewed in its entirety, there is actually no conflict" in the statute between the multiple-use subsection and the subsections requiring maintenance of the trust land base and management for the benefit of the trust and long-term sustained yield of products from the land. As the superior court noted, multiple use can refer to multiple types of development as well as to combining recreation or preservation with development.[25]

25. The law review article from which the management provisions adopted by HB 201 are derived reinforces the superior court's interpretation of the term "multiple use" in the context of state trust lands: "Management for multiple uses on state trust lands varies from the common conception of multiple use as it is applied to federal lands. In the states' case, multiple uses must either contribute to the overall generation of revenues for the trust, must be revenue neutral, or must be funded by other sources." Sally

Moreover, recognition of the "unique scenic, paleontological, and archeological values" of trust lands is not necessarily incompatible with trust principles, even under the stringent rules governing school trust lands. *National Parks & Conservation Ass'n v. Board of State Lands,* 869 P.2d 909, 921 (Utah 1993).

Weiss also takes issue with the superior court's appraisal of the value of the settlement's creation of a separate unit within DNR to manage trust lands. The superior court found

> the addition of a special unit to manage these lands to be an improvement over general management by DNR for several reasons. First, the land managers in the special unit will have a smaller amount of land per person to manage than those in DNR. This should allow managers to be proactive managers instead of passive managers. Second, the special unit members can be trained in the special rules applicable to trust management and will have to apply only those rules and those laws applicable to other state lands which do not conflict with trust management under the Enabling Act. Third, the individuals in the special unit may develop a sense of pride in their special charge.

Even if, as Weiss asserts, the trial court's first point is not supported by evidence, the court's second and third points offer ample support for its conclusion that management by a specialized unit will probably be an improvement over the result of continued litigation.

In summary, the program benefits at best offer a considerable advantage over continued litigation. At worst, they are as favorable as the likely product of continued litigation. Therefore, we hold that the superior court did not err in its appraisal of the settlement's provisions regarding the Trust

Authority, the budgeting procedures, and land management.[26]

### 6. *Enforceability*

Weiss argues that the superior court erred in approving a settlement that "is not legally enforceable." The settlement agreement provides:

> By this agreement, the parties stipulate to a mutual dismissal of all claims and defenses, and acknowledge that the trust is reconstituted in accordance with *State v. Weiss,* 706 P.2d 681 (Alaska 1985). The provisions of ... HB 201 ... constitute material terms upon which the plaintiffs have agreed to a dismissal and acknowledged that the trust is reconstituted. If the Legislature materially alters or repeals any of those provisions, the plaintiffs' sole remedy is a new action alleging that the mental health trust has not been adequately reconstituted and to seek such relief as may be appropriate in light of the plaintiffs' claims. In light of the dismissal of each parties' [sic] claims, no modification of this agreement may be made except in writing signed by all the parties. Nothing in this section shall limit any party's right to enforce this agreement or applicable state statutes.

The superior court noted in its decision granting final approval that "nothing in HB 201, the Settlement Agreement, or this decision can prevent a future legislature from passing legislation affecting the trust, but there are remedy provisions if this happens and deterrents exist." The court stated that, in the event of such legislative action, the class can move for relief from judgment under Civil Rule 60(b)(6). The trial court also relied on the expectation that the Trust Authority, as an advocate for the trust, will

> actively oppose any attempt by the legislature to make a material change in the terms of the settlement and remind the

---

K. Fairfax *et al., The School Trust Lands: A Fresh ⸱ Look at Conventional Wisdom,* 22 Envtl.L. 798, 905 (1992).

**26.** The superior court also noted that approval of the settlement eliminated the risk that the so-called "non-settlement provisions" of HB 201 would be upheld as "curative legislation" for the

State's breach of the trust. If the superior court had not approved the settlement, the non-settlement provisions of HB 201 would have "reconstituted" the trust with the settlement lands but *without the $200 million in cash, establishment* of the Trust Authority, or enactment of the budgeting procedures.

legislature of the possibility of another long and costly lawsuit against the State. The Trust Authority may also be in a position to influence the governor to veto any legislation which makes a material change in this settlement.

Finally, the trial court found that third parties, such as "purchasers of state land, hardrock miners, and oil companies... would undoubtedly lobby the legislature to maintain stability in land titles in order to avoid disrupting land development in Alaska with another lawsuit."

Weiss contends that Rule 60(b) "is not an appropriate enforcement vehicle," citing *O'Link v. O'Link*, 632 P.2d 225, 229 (Alaska 1981), for the proposition that relief under the rule is available only under "the most extraordinary of circumstances." In *O'Link*, we stated: "Clause (6) [of Rule 60(b) ] and the first five clauses of Rule 60(b) ... are mutually exclusive. Relief under clause (6) is not available unless the other clauses are inapplicable.... Clause (6) is reserved for extraordinary circumstances not covered by the preceding clauses." 632 P.2d at 229. This rule, however, does not contradict the well-established practice of using Rule 60(b)(6) "to return the parties to the status quo" after "one party fails to comply" with a settlement agreement. 11 Charles Alan Wright, Arthur R. Miller and Mary Kay Kane, *Federal Practice and Procedure* § 2864, at 352 (1995).[27] A material change of the settlement agreement by the legislature would thus present one of the narrowly defined situations that clearly present "other reason[s] justifying relief" under Rule 60(b)(6).

■ Weiss also argues that the court should not have approved the settlement unless the State agreed "to be bound by a consent decree or otherwise subject to specific performance." The Proponents respond that plaintiffs "retain the ability to specifically enforce the settlement agreement" and "to enforce legislation enacted as part of the settlement." They argue that no agreement could bind future legislatures so as to pre-

vent amendment of the HB 201 settlement statutes. The Proponents are correct. It is a well-established principle that one legislature cannot abridge the power of a succeeding legislature. 73 Am.Jur.2d *Statutes* § 34 (1974); *State v. Lewis*, 559 P.2d 630, 643 (Alaska 1977); *Applications of Herrick & Irish*, 82 Hawai'i 329, 922 P.2d 942, 951 (1996). Thus, it would be impossible for the State to grant the enforcement terms Weiss would require. Furthermore, the proponents are also correct in stating that the court relied primarily on the "product" elements of the settlement, that is, the reconstitution of the trust with land and cash, rather than on the "process" elements contained in the program benefits. The class need not rely entirely on either judicial supervision or "the good faith cooperation of the defendants," *Morales v. Turman*, 569 F.Supp. 332, 334 (E.D.Tex.1983), to ensure the realization of significant benefits of the settlement. Therefore, the superior court did not err in granting approval to the settlement.

### 7. *Summary*

■ In summary, the superior court did not err in its careful evaluation of the settlement and the likely result of continued litigation. After taking into account "the uncertainties of law and fact ... and the concomitant risks and costs necessarily inherent in taking [the] litigation to completion," the court did not abuse its discretion in holding that the settlement is fair, adequate, and reasonable.

### C. *Did the Superior Court Abuse Its Discretion by Establishing the Approval Process?*

Weiss also attacks the process under which the settlement was negotiated and approved. Specifically, he objects to (1) the superior court's definition of the class, (2) the conduct of negotiations between the parties, (3) the notice to class members and the court's consideration of class comments, and (4) the

---

**27.** Because Rule 60(b)(6) is modeled on its federal counterpart, federal authorities are instructive in interpreting the state rule. *See Agostinho v.*

*Fairbanks Clinic*, 821 P.2d 714, 716 n. 4 (Alaska 1991).

schedule established by the court for consideration of the settlement.[28]

### 1. *Definition of the class*

The superior court redefined the class in 1994 as

all persons who are past, present and future beneficiaries of the mental health lands trust created by Congress in the Alaska Mental Health Enabling Act of 1956. The beneficiaries are residents of the State of Alaska who are mentally ill, mentally defective or retarded, chronically alcoholic suffering from psychoses, senile and as a result of such senility suffer major mental illness, and such other persons needing mental health services as the legislature may determine.

The trial court ordered this redefinition on the motion of Weiss and AMHA to make the class "co-extensive with the beneficiaries of the trust" as determined by the superior court's Beneficiary Decision in 1988. Weiss argues that the superior court's Beneficiary Decision erroneously included the developmentally disabled[29] as beneficiaries of the trust and hence members of the class.

The superior court based its Beneficiary Decision on a review of the legislative history of the AMHEA. The court concluded, and Weiss does not dispute, that the version of the bill originally passed by the House included the developmentally disabled as beneficiaries of the trust. Weiss asserts, however, that the Senate "disagreed that they should be included." As evidence for this position, he relies on a comment made by the sponsor of the bill in the Senate, Senator Jackson, that "[t]here are a lot of people who are mentally retarded that should not be under the provision of this bill." The context of this remark, however, suggests that Senator Jackson was concerned that inclusion of the developmentally disabled under the AMHEA's definition of "mentally ill" might lead to their imprisonment or stigmatization, not that he felt they should be excluded as beneficiaries. Furthermore, Senator Jackson never came to a conclusion on the matter;

after a brief exchange, he merely states, "I do not know. My mind is open...." His statement thus provides no evidence of legislative intent to exclude the developmentally disabled as beneficiaries of the trust.

Weiss also argues that the Senate's refusal to adopt language suggested by the Department of Health, Education, and Welfare (HEW) demonstrates its intent not to include the developmentally disabled. The proposed language would have replaced the phrase "mentally ill" in the House version of AMHEA § 202(e) with the phrase "the mental health program of Alaska, including (but not by way of limitation) the out-patient and in-patient care and treatment of the mentally ill, and of the mentally defective and mentally retarded, of Alaska." The version of the AMHEA finally passed by the Senate retained the phrase "mental health program," but dropped the remainder of HEW's proposed language. The report by the House managers noted the difference between the House version, defining the phrase "mentally ill" to include the developmentally disabled, and the Senate version, using the phrase "mental health program" with no definition. The managers stated that they "accepted this Senate amendment which broadens the use of the revenues for use of the Alaska mental-health program rather than for the hospitalization and care of the mentally ill in Alaska." Because the House version included the developmentally disabled, the superior court reasonably concluded that a version that "broadens" the program would also include those individuals. Moreover, the relatively vague phrase "mental health program" does not support an intent by the Senate to exclude potential beneficiary groups. The Senate's decision not to adopt the rest of HEW's proposed amendment shows little more than a desire to avoid cumbersome and unnecessary language.

■ The superior court's conclusion is also supported by other parts of the AMHEA.

---

28. Weiss also argues that the trial court abused its discretion by not granting preliminary approval to the Chapter 66 settlement and by denying a motion to substitute Billy R. Cross for John

Martin. Because our decision moots these issues, we do not address them.

29. See *supra* note 4.

Along with the land grant, the AMHEA provided for grants

> to the Territory of Alaska to assist it to carry out plans, submitted by the Governor of the Territory or his designee and approved by the Surgeon General, for an integrated mental health program for the Territory, including outpatient and inpatient care and treatment.

AMHEA § 201. This suggests that Congress intended the meaning of the term "mental health program" to be determined by the Territory and the Surgeon General. The superior court found, and Weiss does not dispute, that the first mental health program enacted by the Territory in 1957 defined "mentally ill individual" as "an individual having a psychiatric or other disease or senile changes which substantially impair his mental health or who is mentally deficient." The superior court also noted that one impetus for passage of the AMHEA was to end the need for placing Alaskans with mental problems in Morningside Hospital in Portland. These Alaskans included the developmentally disabled. Therefore, we hold that the superior court did not err in determining that Congress intended the developmentally disabled to be beneficiaries of the trust and hence members of the plaintiff class in this litigation.

### 2. Settlement negotiations

Weiss argues that the HB 201 settlement was the result of collusion between the State and counsel for the H.L. and Bosel Intervenors.[30] Weiss claims that collusion occurred between the State and Proponents because Proponents (1) "caused the State to withdraw from the Chapter 66 Settlement Agreement by being willing to support" the HB 201 settlement, (2) supported the "passage of legislation [HB 201] that provided for the dismantling of the trust if their negotiated settlement is not approved by the courts," (3) "negotiated a settlement and a schedule that

would not allow judicial determination of whether the [Trust Authority's] key right to spend the Trust's income free of legislative appropriation was constitutional," and (4) "assured the mental health community that they would only accept a settlement that contained certain elements to gain their support and then negotiated a settlement that did not contain those elements." The superior court considered these arguments in its decision granting preliminary approval and found no evidence of collusion. Instead, it found that Weiss's points merely demonstrated "that the attorneys had legitimate disagreements."

 A trial court "may not approve a proposed settlement if it is the product of fraud or overreaching by, or collusion among, the negotiating parties." *In re Pacific Enters. Secs. Litig.*, 47 F.3d 373, 378 (9th Cir. 1995) (quotation omitted). Black's Law Dictionary defines "collusion" as follows: "An agreement between two or more persons to defraud a person of his rights by the forms of law, or to obtain an object forbidden by law. It implies the existence of fraud of some kind, the employment of fraudulent means, or of lawful means for the accomplishment of an unlawful purpose." *Black's Law Dictionary* 264 (6th ed. 1990). In the absence of evidence to the contrary, "courts generally attach 'a presumption of correctness ... to a class settlement reached in arms length negotiations between experienced, capable counsel after meaningful discovery.'" Herbert B. Newberg & Alba Conte, 2 *Newberg on Class Actions* § 11.28, at 11–59 (1992) (quoting *Manual for Complex Litigation, Second* § 30.44 (1985)). Evidence suggesting collusion may include significant differences in the relief received by different groups within the class or the simultaneous negotiation of attorney's fees and class claims. *See Manual for Complex Litigation, Third* § 30.42 (1995).

---

**30.** Weiss also argues that the superior court erred by failing to make a specific finding that the class was adequately represented. The case upon which Weiss relies, *In re General Motors Corp. Engine Interchange Litig.*, 594 F.2d 1106, 1124 & n. 21 (7th Cir.1979), supports the proposition that the court must consider whether the class is adequately represented by the "represen-

tative parties" in the action under Alaska Civil Rule 23(a)(4). However, neither that case nor any other authority requires the trial court to make a specific finding that the class is adequately represented by counsel. Even if there were such a requirement, the superior court's consideration of the conduct of the settlement negotiations by Proponents' counsel would have met it.

Given these principles, we conclude that even if Weiss's first three allegations are true, they do not establish collusion. As Proponents point out, Weiss does not allege that secret meetings were held, that Proponents' counsel excluded his counsel from meetings, that settlement proposals were not relayed as they were received, that he was not allowed to comment on the proposals, or that he was not free to negotiate independently with the State. Furthermore, there is no argument that Proponents or Proponents' counsel benefitted from the settlement unfairly. The superior court properly found that these arguments show merely "that the attorneys had legitimate disagreements."

Weiss's principal evidence supporting the fourth allegation is a letter written by counsel for AMHA purportedly documenting an agreement as to negotiating strategy between counsel. The superior court specifically found that "the attorneys had legitimate disagreements over the interpretation" of that letter. While Weiss argues that the letter embodied a "formal agreement" representing "absolute bottom line requirements for a settlement," Proponents interpret the letter "as evidence of Weiss's counsel's continued support for the basic settlement proposal." Considering the ambiguous language of the letter, the fact that counsel for Proponents never responded to it, and the continued willingness of counsel for Weiss to participate in a settlement even after the alleged agreement had been "breached," the superior court did not err in finding that the letter showed no evidence of collusion on the part of counsel for the H.L and Bosel Intervenors.

### 3. *Notice*

Notice of the proposed settlement was sent to every household in Alaska and to 1400 providers of mental health and other services. In addition, notice was published in newspapers, announced on radio and television, distributed on audio cassette, published in Braille and large print, and translated into Spanish, Filipino, Inupiaq, and Yupik. The notice allowed for comments by members of the public, including family, guardians and friends of beneficiaries, and provided a form allowing commentors to identify themselves as beneficiary members of the class, guardians or relatives of a class member, or members of the public. The trial court received 1088 comments, about 150 from class members, eighty from advocacy groups or people "indicating they work in the mental health field," and about 170 from family members and guardians of class members. The court treated comments from these groups as class comments, but considered all others public comments and gave them little weight. Weiss argues that the superior court abused its discretion in approving the content of the notice and by allowing individuals who were not members of the class to comment.

Weiss objects to the content of the notices, asserting that it: (1) was "silent on the State's unilateral right to alter the settlement;" (2) failed to inform the class of the risk that the power of the Trust Authority to spend trust funds without legislative appropriation might be found unconstitutional; (3) did not mention that more litigation might be required to ensure that land management regulations comply with the AMHEA; (4) did not urge the class to "consider the importance of cash to them;" (5) did not "describe the value of the original Trust and the value of the HB 201 Settlement Trust; (6) stated that the settlement contained 930,000 acres as compared with 1,000,000 acres "without any kind of disclosure that only land that no one else wanted is included;" (7) incorrectly suggested that the "settlement commits the State and Trust Authority to providing an adequate mental health program;" and (8) falsely stated that the Trust Authority would "oversee" management of trust land.

According to one authority,[31]

[t]he contents of a Rule 23(e) notice are sufficient if they inform the class members of the nature of the pending action, the general terms of the settlement, that complete and detailed information is available from the court files, and that any class member may appear and be heard at the hearing.

The notice should be brief and reasonably clear to the minimally sophisticated

---

**31.** See *supra* note 27.

layperson. However, the terms of the settlement and the course of the litigation should not be oversimplified to increase readability at the expense of accuracy and completeness. Of course, as the length of litigation, the complexity of issues, and the variety of terms of settlement increase, their description in a Rule 23(e) notice will generally be more elaborate.... [W]here some multiple plaintiffs oppose a proposed class settlement, the court in its discretion may insist that notice of the settlement under those circumstances be neutral in tone and should not include either a party's or the court's arguments for or against settlement.

2 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 8.32 (3d ed. 1992) (footnotes omitted).

The notice provided by the superior court meets these criteria. Moreover, adopting Weiss's suggestions would have created a substantial risk of either misleading class members or violating the neutral tone called for by the class's split over the settlement. The trial court successfully struck a difficult balance between providing enough information for the class to evaluate the settlement and making the notice understandable to as many class members as possible. Therefore we conclude that the superior court did not abuse its discretion by approving the content of the notice.

In arguing that the superior court abused its discretion by allowing comments by individuals who are not class members, Weiss relies on *Gould v. Alleco, Inc.*, 883 F.2d 281 (4th Cir.1989). This case stands for the unobjectionable proposition that only class members have *standing* to object to settlement proposals. *Id.* at 284. The *Gould* court, however, explicitly stated that its "ruling regarding the lack of standing of non-class members to object to proposed settlements should not be read to restrict the trial court's authority to consider or even solicit the views of non-parties to proposed class settlements." *Id.* at 284 n. 3.

■ Accepting comments from individuals outside of the class was particularly appropriate in this case because, as the supe-

rior court stated, "many members of the class may not be able to understand the notice or speak for themselves." Thus, the court properly considered the "comments from family members, guardians, advocacy groups, mental health professionals, and others working directly with trust beneficiaries" as class comments. Furthermore, the court, by including a space on the notice form for commentors to identify their status with respect to the litigation, provided adequate protection against the risk of improperly considering comments from the general public. Judge Greene adopted an excellent procedure both for disseminating notice of the proposed settlement and for distinguishing class comments from public comments so as to evaluate each appropriately.

### 4. *Due process*

Finally, Weiss argues that he was denied due process because the superior court did not grant "adequate time to brief, prepare for and conduct the hearings" and "did not give the time to its deliberations necessary to fulfill [his] right to a fair and impartial decision." We have stated that due process under the state constitution requires "notice and opportunity for hearing appropriate to the nature of the case." *Carvalho v. Carvalho*, 838 P.2d 259, 262 (Alaska 1992) (citations omitted). The United States Supreme Court has further stated that due process under the Federal Constitution requires that every person "shall have the protection of [a] day in court, and the benefit of the general law, a law which hears before it condemns, which proceeds not arbitrarily or capriciously, but upon inquiry, and renders judgment only after trial." *Truax v. Corrigan*, 257 U.S. 312, 332, 42 S.Ct. 124, 129, 66 L.Ed. 254 (1921).

■ Weiss cites a number of cases in support of his position that the superior court failed to give him adequate time to satisfy his due process rights to contest the HB 201 settlement. In these cases, however, the injured party was denied all opportunity for a hearing, not merely constrained by the

court's schedule.[32] *E.g. Carvalho v. Carvalho*, 838 P.2d 259, 263 (Alaska 1992); *Frontier Saloon, Inc., v. Alcoholic Beverage Control Bd.*, 524 P.2d 657, 658 (Alaska 1974). In this case, the trial court established a seven-month schedule to consider the settlement and conducted a four-day evidentiary hearing on preliminary approval and a ten-day evidentiary hearing on final approval. Weiss introduced considerable testimony in support of his position, including testimony of twelve expert witnesses at the final approval hearing, and exhaustively briefed his opposition to both preliminary and final approval as well as a number of other related issues. Weiss clearly had ample opportunity to present his case.

■ Furthermore, Weiss fails to identify how any time constraints caused him serious prejudice. We will not disturb a trial court's refusal to grant a continuance unless a party has been seriously prejudiced by that refusal. *House v. House*, 779 P.2d 1204, 1206 (Alaska 1989). In this case, as in *House*, the lower court's ruling was "based on a review of all the relevant evidence and ... the complaining party had reasonable opportunity in court to introduce evidence and contest the other side's evidence. Inability to mount a successful case does not mean that due process was violated or that an abuse of discretion occurred." *Id.* at 1207. Therefore we hold that the superior court did not violate Weiss's due process rights by establishing and adhering to its schedule for final approval.

■ We also reject Weiss's assertion that the superior court failed to give adequate consideration to his claims. Judge Greene's thorough, deliberative, and well-reasoned analysis is documented by her fifty-eight page preliminary approval memorandum, her 137-page final approval memorandum, and her other decisions resolving earlier stages of this litigation. We are satisfied that Judge Greene gave Weiss's position the full benefit of her able consideration.

## IV. CONCLUSION

In closing, we echo Judge Greene's thoughts on the resolution of this lengthy litigation:

> The settlement process as a whole has done some harm. The class and their families are very divided on the question of this settlement. Some may feel cheated and abandoned by this decision approving it. Others may feel vindicated. Hopefully, neither will persist in those feelings. Whether or not to approve this settlement was a very difficult and complex decision. The court shares many of the concerns that have been expressed by the class. The task that lies ahead for the beneficiaries, their friends and families is to come together to make the best of this agreement. The beneficiaries will need to speak with one voice again, if their concerns are not heeded. They need to heal the divisions that exist today and vow as recommended by one commenting beneficiary to go "out of the courts and into the budget."

We conclude that Judge Greene's approval of the HB 201 settlement demonstrated a sound understanding of the relevant authority and the facts of this case, as well as a keen regard for the rights and interests of the plaintiff class. Weiss has not clearly demonstrated that approval of the settlement on the basis that it was fair, adequate, and reasonable constitutes an abuse of discretion. Therefore, we AFFIRM the superior court's decision.

MATTHEWS, J., not participating.

---

**32.** Weiss also cites *Channel Flying, Inc. v. Bernhardt*, 451 P.2d 570, 572–73 (Alaska 1969), to support the statement that we have "recognized the due process implications of forcing a litigant to proceed without having an adequate opportunity to prepare." In *Bernhardt*, we stated that a trial judge erred by not allowing a party reasonable time to respond to late filings raising matters "which petitioners would find it important to meet if they were to succeed in their efforts to obtain a preliminary injunction." *Id.* at 573. Weiss makes no allegation that the parties did not have equal amounts of time to prepare and present their cases and to respond to the arguments of their opponents.